# EXHIBIT 5



By order of the court, *Judge Juan T. Lizama*



E-FILED
CNMI SUPERIOR COURT
E-filed: Nov 13 2007 3:25PM
Clerk Review: N/A
Filing ID: 17026598
Case Number: 07-0152-CV
N/A

2.

3.

4.                    **IN THE SUPERIOR COURT**
                              **OF THE**
5.       **COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS**

6.   **UNITED MICRONESIA**                    **CIVIL CASE NO. 07-0152**
     **DEVELOPMENT ASSOCIATION, INC.**
7.   **("UMDA"), and UMDA**
     **LAOLAO LLC,**
8.

9.                    **Plaintiffs,**

10.          v.

11.  **ROBERT PFAFF, et al.,**                **ORDER GRANTING PRELIMINARY**
                                              **INJUNCTION AND DENYING**
12.                  **Defendant.**           **SUMMARY JUDGMENT**

13.

14.        Plaintiffs, United Micronesia Development Association, Inc. ("UMDA") and UMDA

15.  LaoLao LLC ("LLC"), move this Court to implement a preliminary injunction restraining certain

16.  Defendants[1] from replacing UMDA as manager of LLC or taking any action on behalf of LLC

17.  pending resolution of the ownership of LLC. Plaintiffs also seek to maintain the remainder of

18.  proceeds from the sale of LLC's interest in Saipan Land Development, Inc. ("SLDI") in a Court-

19.  controlled account until their ownership is determined. Various Defendants have in turn moved for

20.  partial summary judgment on the issue (or on Plaintiff's Twelfth Cause of Action) regarding who is

21.

22.  the manager of LLC. This opinion addresses only the pleadings filed in connection with the

23.  preliminary injunction motion and Dingee's motion. For reasons stated herein, the Court grants in

24.

25.  _____
        [1]    These Defendants include LLC Member GET Realty Trust, its alleged trustee Thomas Sorenson, UMDA
26.  Shareholder Concorde Trust, its alleged trustee Rothschild Guernsey Limited, LLC Member Monte Perucho
     Investiduras LLC, its alleged manager Raymond McCall, LLC Member Sasquatch II, its alleged owner Bigelow Asset
     Management, and LLC Member Paul Dingee.

                                              1

1. full Plaintiffs' motion for a preliminary injunction, and denies Dingee's motion for partial summary
2. judgment.

## I.    PROCEDURAL BACKGROUND

This matter originally came before the Court on Plaintiffs' May 18, 2007 motion for a temporary restraining order ("TRO") and preliminary injunction. On May 23, 2007, the Court partially granted the TRO by freezing the SLDI proceeds ("the Fund") in pre-existing accounts and setting a hearing on the issue of the proper manager for June 4, 2007.

On June 1, 2007, Dingee filed a motion for partial summary judgment to determine whether he or UMDA is the manager of LLC.

The June 4, 2007 preliminary injunction hearing was continued to August 14, 2007, at which time the Court also heard arguments on Dingee's summary judgment motion. The only change to the May 23, 2007 TRO was the placement of the Fund in interest-bearing certificates of deposit.

Following the August 14, 2007 hearing, the Court determined that it needed additional information regarding the circumstances that preceded the formation of LLC. The Court's August 23, 2007 order commanded UMDA board members to appear on September 18, 2007 to testify on said matters. The TRO remained in place.

Prior to the September 18, 2007, counsel for UMDA requested a continuance until October 30, 2007. The continuance was granted and the TRO was maintained.

From October 30, 2007 to November 1, 2007, the Court heard testimony from Defendant Robert Pfaff, UMDA President Russell Snow, and UMDA Directors Joshua Koshiba, Jose Lifoifoi, and Eduardo Calvo. Robert O'Connor appeared on behalf of UMDA, and Timothy Bellas appeared on behalf of LLC. Richard Pierce appeared on behalf of Defendant Raymond McCall until the parties and the Court agreed that the proposed preliminary injunction would not apply to McCall

2

1.  personally. Robert Torres appeared on behalf of Defendants Dingee, Monte Perucho Investiduras
2.  LLC, Irizarry & McCall P.C. Profit Sharing Plan, and Pirouette LLC Profit Sharing Plan. John
3.  Pierce appeared Pro Hac Vice on behalf of Defendant GET Realty Trust.

Colin Thompson appeared on behalf of Defendants Robert Pfaff, KCT Irrevocable Trust,
Thomas Sorenson, and Sasquatch II. Pfaff declined to provide any testimony regarding his
involvement in UMDA or LLC, however, as he chose to exercise his fifth amendment right to
refrain from incriminating himself.

## II.    FACTUAL BACKGROUND

For purposes of both motions, the Court places significant weight on the following evidence
garnered from testimonies and affidavits:[2]

UMDA is a CNMI-based company founded in 1966 for the purpose of allowing
Micronesians to participate in large-scale business ventures and investments.

Michael Grandinetti became UMDA's CEO and a director in the late 1990s, and was an
officer until he resigned (Koshiba Testimony). The UMDA Board was comprised largely of
political and social leaders throughout Micronesia, most of whom had little to no business
experience. The Board had little knowledge and involvement in UMDA's corporate affairs, and
relied heavily on Grandinetti, Director/COO Peter Sinclair, and Attorney Cindy Adams for
information and voting direction (Koshiba Testimony). The Board held meetings only two or three
times a year, and Directors did not consider any UMDA business outside of the meetings (Koshiba
and Lifoifoi Testimonies).

Pfaff, a CPA and tax lawyer introduced to UMDA by Grandinetti in the 1990s, sold tax
strategies to UMDA through his company KPMG. In 1999, Pfaff became a Director of UMDA.

---

[2]    This section does not serve as undisputed facts for purposes of summary judgment or Rule 56(d).

3

Although UMDA shareholders had a right of first refusal over UMDA shares, Grandinetti granted UMDA shares to Pfaff and other non-shareholders in return for Pfaff's tax strategies. The tax strategies were ultimately unsuccessful, and Pfaff and others were later indicted for, *inter alias*, failing to report side payments received while working with KPMG on Micronesian transactions.

While Grandinetti granted shares to Pfaff and other non-shareholders, he declined to sell the shares of departing Director Debroom to Directors Koshiba and Lifoifoi, on grounds that this would be unethical (Koshiba and Lifoifoi Testimonies).

At some point, Grandinetti received $2.5 million in side fees from Pfaff.

Grandinetti, Sinclair, Pfaff, and others personally profited from business transactions in which UMDA was involved. They did not inform UMDA of these profits or otherwise account for them.

On September 16, 2004, UMDA through Grandinetti issued a letter to Broker Tim Goodwin of Pacific Rim offering to buy 100% of the stock in SLDI. SLDI operated Saipan LaoLao Golf Course on land leased through the CNMI Government via the Marianas Public Land Corporation (later the Marianas Public Land Agency, or MPLA).

In October 2004, the Board considered a $52 distribution to shareholders based on a sale of UMDA's cable assets to Tele-Media for $35 million in cash (Snow Testimony). By the end of October 2004, however, UMDA canceled the Tele-Media deal (November 13, 2004 Board Meeting Minutes).

On November 9, 2004, UMDA through Grandinetti and Sinclair entered into a Stock Purchase Agreement with Shimizu Corporation, the owner of SLDI.

1.    At the November 13, 2004 meeting, the Board considered an alternative offer from Seaport

2.    Capital to buy the cable holdings, and resolved that if the deal closed prior to December 20, 2004, it

3.    would grant shareholders $52 dividends (November 13, 2004 Board Meeting Minutes).

4.    At the same meeting, Grandinetti suggested that some of the revenue from the cable sale be

5.    used to invest in a golf course holding company, SLDI. Grandinetti proposed that UMDA hold 56%

6.    of the SLDI shares and create a limited liability company (the LLC) as an investment partner (Snow

7.    and Calvo Testimonies).

8.

9.    Under Grandinetti's plan, UMDA would hold 50.6% of the LLC (in order to maintain

10.   control of its direction), and UMDA directors would be invited to hold the rest. Grandinetti

11.   proposed that Pfaff and "his group" also be part of the LLC, as they had both money to invest and

12.   expertise in managing golf courses (Calvo, Koshiba, and Lifoifoi Testimonies). It was not typical

13.   for the Board to partner with other investors, and some of the Board members suggested that

14.   UMDA should pursue the golf course opportunity on its own (Lifoifoi and Koshiba Testimonies).

15.   Nevertheless, the Board ultimately agreed with Grandinetti's partnership proposal, based on

16.   Grandinetti's assertion that it would be better to share the investment risk with the "Pfaff group"

17.   and to provide UMDA shareholders with larger dividends from the cable sale (Snow and Koshiba

18.   Testimonies). The Board failed to conduct any investigation as to Pfaff's background, and, until the

19.   instant suit, the Board was largely ignorant of the names and backgrounds of any of the investors in

20.   the LLC.

21.

22.   The Board passed a resolution authorizing UMDA to invest $4.5 million to acquire 56% of

23.   SLDI holdings and to find a partner to invest the other $4 million needed (November 13, 2004

24.   Board Meeting Minutes).

25.

26.

1.      Although Grandinetti was supposed to call each director and offer him a chance to
2. participate in the LLC, Grandinetti made no further effort to involve Directors Koshiba, Lifoifoi,
3. Tenorio, and Reklai (Lifoifoi and Koshiba Testimonies). These individuals likewise did nothing
4. further to pursue investments and were unaware until now that Calvo and Snow's wife had invested
5. through holding companies they created. Calvo, who was personally contacted by Grandinetti to
6. invest, maintains that he was unaware that Grandinetti never called the other directors. The directors
7. did not discuss investments among themselves (Calvo Testimony), and Lifoifoi, who had
8. introduced his former business partner John Jones to the investment opportunity, was unaware until
9.
10. later that Jones had invested (Lifoifoi Testimony).
11.      UMDA and Shimizu entered a memorandum of understanding for UMDA's purchase of
12. SLDI on December 29, 2004. The following day, the Board signed LLC's Original Operating
13. Agreement, which gave UMDA 100% of LLC's interests.
14.      MPLA conditionally approved the transfer to UMDA of Shimizu's stock in SLDO on
15. January 5, 2005.[3] Shimizu and UMDA signed and recorded an Assignment Agreement on February
16. 15, 2005. The same day, LLC's First Amended Operating Agreement (FAOA) changed UMDA's
17. holdings in LLC from 100% to 43/85.[4] Nevertheless, in February 2, 2005 and February 22, 2005
18. letters, Grandinetti represented to MPLA that LLC was 100% owned by UMDA. Per Grandinetti's
19. instruction, Lifoifoi stated to MPLA that LLC was fully owned by UMDA (Lifoifoi Testimony).[5]
20. MPLA approved the transfer of UMDA's interest to LLC on April 7, 2005.
21.
22.
23.
24. [3]     Pursuant to the MPLC lease, MPLC approval was necessary for assignment of the lessee's stock ownership. SLDI, the actual lessee, continued to be the lessee of the property throughout its successive ownership by Shimizu, UMDA, and LLC.
25. [4]     The Court does not have on file any copy of the FAOA signed by Calvo for CCH or Snow for Restated Cheryl Ann Snow Trust.
26.

1.    On February 16, 2005, UMDA through Grandinetti transferred 44% of its stock in SLDI to

2.  LLC.

3.    Grandinetti transferred LLC membership interests as follows:

4.    ➢    10 units to KCT Irrevocable Trust and 5 units GET Realty Trust through Trustee

5.  Thomas Sorenson (pursuant to an agreement signed by Grandinetti on February 15, 2005 and by

6.  Sorenson on April 10, 2005);

7.    ➢    1 unit to Paul Dingee (via agreement signed by Grandinetti on February 15, 2005 and

8.  by Dingee on April 20, 2005);

9.    ➢    5 units to Davina Limited (via agreement signed by Grandinetti on February 15,

10.  2005 and by Davina Limited directors on April 27, 2005);

11.

12.    ➢    5 units to Monte Perucho Investiduras, LLC (via agreement signed by Grandinetti on

13.  February 15, 2005 and by owner Tapia America LLC through Raymond McCall on September 4,

14.  2005);

15.    ➢    4 units to Sasquatch II (via agreement signed by Grandinetti on February 15, 2005);

16.    ➢    5 units to Rothschild Trust Guernsey Limited (via agreement signed by Grandinetti

17.  on February 15, 2005);

18.

19.    ➢    1 unit to John Jones (via agreement signed by Grandinetti on February 15, 2005 and

20.  by John Jones on an unspecified date);

21.    ➢    2 units to Yap Cooperative Association (via agreement signed by Grandinetti on

22.  February 15, 2005 and by Controller Donnie Gilfen on an unspecified date);

23.

24.

25.  _____
5    When Grandinetti asked Lifoifoi to deal with MPLA, Lifoifoi had not yet seen the FAOA of LLC and was
unaware of LLC's interests. He apparently understood (and told MPLA) that the golf course property itself would be

26.  100% UMDA-owned, while other entities would be investing in related development.

1.        ➤    2 units to CCH Saipan LLC (via agreement signed by Grandinetti on February 15,

2. 2005 and by Eduardo Calvo on an unspecified date);

3.        ➤    2 units to Restated Cheryl Anne Snow Trust (via agreement signed by Grandinetti on

4. February 15, 2005);

5.        On March 4, 2005, pursuant to shareholder approval, UMDA sold its cable assets to Seaport

6. for $25 million ($10 million less than contemplated in the original deal) (March 18, 2005 Board

7. Meeting Minutes). Shareholders also approved a $40 dividend (as opposed to the previously

8. contemplated $52 dividend).

9.

10.       The Second Amended Operating Agreement (SAOA), orchestrated by Grandinetti and

11. Sinclair (Calvo Testimony), changed UMDA's holdings in LLC from 43/85 (50.6%) to 0%.

12. According to Snow, the SAOA wasn't discussed by the UMDA Board—it was "just issued."

13. Nevertheless, representatives for all members signed the SAOA and entered revised subscription

14. agreements.[6] Although Plaintiffs have called the SAOA illegal, they have attached it to their

15. complaint and rely on it for several causes of action.

16.       The Board learned about Pfaff's indictment in *U.S. v. Stein* (Case S 05 Cr. 888 (LAK) in the

17. Southern District of New York) during the first half of 2006, but understood at the time that the

18. indictment did not involve UMDA (Calvo Testimony).

19.       Grandinetti appeared at a Board meeting in August 2006 and stated that he had been accused

20.

21. of taking side fees on a transaction. He acknowledged that he had received the fees, but stated that

22. they did not belong to UMDA and that his action did not damage UMDA (Koshiba Testimony).

23. Grandinetti did not disclose that investigations regarding his activities had begun in the early 2000s,

24.

25. ⁶    Most representatives for LLC members signed in July 2006. Calvo did not sign for his company CCH until
March 27, 2007. He testified that he did not read the SAOA before signing it, as he only had the signature page and

26. Sinclair informed him that his signature was necessary for closing of the Kumho deal.

1. that the side fees amounted to $2.5 million, and that they came from Pfaff. Grandinetti then tearfully
2. resigned from his position as President or Chief Executive Officer. Sinclair became UMDA's
3. President.
4.     Koshiba initially wanted to draft a resolution for the U.S. prosecutor in *Stein* stating that the
5. Board accepted Grandinetti's receipt of side fees, based on the Board's understanding that it did not
6. hurt UMDA.
7.     The Board members did not directly confront Grandinetti about his activities, but, following
8. his announcement, considered removing him from UMDA (Lifoifoi Testimony). The directors
9. apparently decided that they couldn't do without Grandinetti's management of the golf course,
10. however, and allowed him to remain associated with UMDA as Chairman of the Board (Lifoifoi
11. 
12. Testimony).
13.     After Grandinetti's confession and newspaper reports of the indictments of Grandinetti and
14. Defendants Pfaff, Makov, and Larson, the Board sought to repurchase the UMDA shares and LLC
15. interests of Pfaff and those they believed to be connected with Pfaff (Koshiba and Calvo
16. Testimonies). At an October 20, 2006 board meeting, the Board resolved to create a committee to
17. 
18. send out repurchase offers. The Board believed that repurchase was necessary to meet its fiduciary
19. duty to UMDA and to convince MPLA to extend SLDI's lease on the golf course (which had 27 out
20. of 40 more years to run at the time) (Calvo Testimony). The Board created a share repurchase
21. committee with Calvo as its leader. Calvo testified that UMDA management had no role in the
22. share repurchasing, but that Calvo was in contact with Sinclair for information.
23.     Koshiba, a member of the committee, testified that he wanted to learn how Pfaff group
24. became a shareholder of UMDA when Koshiba was unable to buy a departing shareholder's shares
25. years before. At this point, Koshiba was still unaware that the LLC was separate group from
26.

UMDA, and that holding companies created by Calvo and Snow's wife were members of the LLC. None of the directors knew anything about entities that comprised the "Pfaff group."

In November 2006, UMDA sent the "Pfaff group" repurchase offers that would expire on December 8, 2006. LLC members were offered $75,000 per membership unit rather than the $100,000 they originally paid.[7] UMDA shareholders were offered $9.25 per share, although the market value of the share was substantially higher. According to Calvo, the reason for the low offering was market/tourism decline, the problem of needing to renegotiate the MPLA lease—not any knowledge on the part of the directors of the impending sale of SLDI to Kumho Asiana Group. Calvo testified that Sinclair and Grandinetti were the only UMDA affiliates involved in the Kumho negotiation.

Dingee, a recipient of the letter, sought guidance from the law firm of Pfaff and McCall. Pfaff referred Dingee to attorney O. Russell Murray. Murray, on behalf of Defendants who had received similar offers,[8] sent a December 3, 2006 letter to Calvo requesting additional information about the purchase offer and financial information pertaining to the LLC and UMDA. Murray also asked Calvo about the reason for the low figure in light of talk of the impending sale of SLDI to a Korean group.

Calvo forwarded Murray's letter to UMDA management (Sinclair), and asked him to advise Calvo as to how to respond. Calvo testified that he did not take seriously Murray's mention of the Korean group deal. He testified that he thought the repurchase offer would expire before he had time to send out further information, although he would have negotiated past December 8, 2006 if a deal appeared imminent.

---

[7]    A unit represents a 1/42 ownership interest and a concomitant 1/42 voting interest.

[8]    These include Concorde Trust, Monte Perchuro, Pirouette LLC Profit Sharing Plan, Dingee, Sasquatch, JL Capital Trust, KCT Trust, Point du Hoc Trust, Global Leader Pension Plan, Davina Trust, and Morley Pension Plan.

1.      Calvo received nothing substantive from Sinclair prior to December 8. He testified that the

2.    issue became moot once he learned of the impending Kumho sale, as an attempt to repurchase

3.    interests just before a sale would be improper. Calvo would not receive any further response from

4.    Murray until March 2007.

5.      On December 14, 2006, Sinclair entered into brokerage agreement with Tim Goodwin for

6.    sale of LLC's and UMDA's interests in SLDI. Calvo asserts that he learned of this just before

7.    December 26, 2006,[9] when UMDA and Kumho entered into a Memorandum of Understanding

8.    under which Kumho would buy all of UMDA's and LLC'S interests in SLDI.

9.

10.      In January 2007, Grandinetti pled guilty to making a false statement to federal authorities

11.   regarding his failure to inform the UMDA Board about his side fees. According to public filings by

12.   the federal government, he is now a cooperating witness against Robart Pfaff.

13.      On February 28, 2007, for a total of $16,600,000, the Kumho transaction was completed

14.   without formal notice to or approval of the LLC members believed to comprise the "Pfaff Group."

15.   UMDA placed $830,000 into an escrow account for six months for any subsequent claims by

16.   Kumho. Dingee asserts that he and other Defendants had no knowledge of and did not consent to

17.   the sale, and that he only learned about it in a March 8, 2007 Saipan Tribune article. Plaintiffs admit

18.   that they wanted to keep the sale secret to avoid interference on the part of Defendants.

19.

20.      In March 2007, Snow replaced Sinclair as President of UMDA, and Grandinetti was

21.   removed entirely. UMDA management paid all proceeds due to UMDA as well as $1,859,002.53 to

22.   LLC members Yap Cooperative Association, CCH Saipan, LLC, Restated Cheryl Anne Snow

23.   Trust, John Jones, and Sasquatch. According to Snow, the Board chose not to issue the

24.   distributions of those they believed to be related to Pfaff because of concern about the Board's

25.

26.   [9]    Lifoifoi gave conflicting testimony as to whether he learned of the impending sale in October 2006 or December 2006.

11

fiduciary duty to UMDA shareholders in the event that Defendant-investors' contributions had been derived from UMDA misappropriations.

Calvo testified that a committee was formed in early 2007 to consider the possibility of suing the "Pfaff group." Once the sale went though, there was a concern to sue as soon as possible so as not to pay any distributions to the "Pfaff group" (Calvo Testimony).

On March 2, 2007, UMDA issued a letter to the offerees of Calvo's November 2006 letter stating that UMDA had changed its mind and was withdrawing its purchase offer. Recipients of the March 2 letter sent emails to Calvo and Snow asking for information regarding the sale. Dingee received from Snow a copy of the Purchase and Sale Agreement.

On April 26, 2007, Michael Dotts filed the instant action in the names of UMDA and LLC to determine the owner of the Fund. Dingee asserts that he and the Defendants were unaware of the April 26, 2007 complaint.[10]

Plaintiffs suggest that Defendants were aware of the complaint, and introduce evidence suggesting that Defendants planned to gain access to the proceeds from the sale without Snow's knowledge. *See* April 27, 2007 email from Defendant McCall (UMDA's previous attorney) to Defendants Pfaff, Larson, and Dingee (Bellas SJ Opp. Dec. Ex. 6) and Dingee's Deposition at 97:13-17; 113:10-20 (Ex. 1).

On April 30, 2007, the Defendant LLC Members who appear to control over 70% of the ownership in the LLC signed a "Notice of Change in Management" (hereafter, "the Notice") agreeing to remove UMDA as the Manager of the LLC and replace it with Dingee. The signatories

---

[10]   The complaint was served on Defendants McCall and Irizarry, McCall & Squarell, P.C. on April 27, 2007, and on Pfaff and other defendants on May 1, 2007. Dingee was not served until May 24, 2007, and then with the First Amended Complaint.

12

1. included Sorenson for GET, Rothschild Guernsey Limited for Concorde Trust, McCall for Monte
2. Perucho, Bigelow Asset Management for Sasquatch, and Dingee.
3.     On the same day, Dingee notified Bank of Hawaii of the removal action. Dingee also sent a
4. notification letter to UMDA requesting transfer of all of LLC's records.
5.     On May 3, 2007, UMDA sent the Bank of Hawaii a letter urging it to ignore Dingee's notice
6. of the change in LLC's management.
7.     On May 4, 2007, UMDA sent Dingee a letter offering to give him his distribution, subject to
8. a reservation of rights, and expressing concern regarding the change in management. The letter
9. asked Dingee to provide authorizations to act and verifications of the signatures of those signing the
10. Notice. It is not clear whether Dingee took such action. Regardless, he never received his share.
11. 
12.     Plaintiffs' First Amended Complaint (FAC), filed May 15, 2007, added additional
13. allegations and causes of action.
14.     At the time of the TRO motion, the Fund was in three Bank of Hawaii accounts containing
15. $5,295,336.41 (the "Fund") belonging to LLC. The certificates of deposit now containing the Fund
16. have earned more than $17,000 in interest since then. Following completion of the Kumho
17. transaction, money from the escrow account was distributed to "non-Pfaff entities" and to the Fund.
18. 
19.     Other than administrative matters and the ultimate distribution of the Fund, the LLC has no
20. further business.
21.         **III.    APPLICABLE STANDARDS**
22.     Although the arguments at the August 14, 2007 hearing for preliminary injunction and
23. partial summary judgment addressed the same issues, the standards for granting the motions are
24. different.
25. 
26. 

13

1.      The purpose of a preliminary injunction is to "preserve the status quo between the parties"

2. and "not to determine the merits of the case." *Villanueva v. Tinian Shipping and Transp., Inc.*, 2005

3. MP 12, ¶ 19 (2005).

4.      A court considers the following factors:

5. (1) whether the plaintiff has a strong likelihood of success on the merits;

6. (2) the level of the threat of irreparable harm to the plaintiff if the relief is not granted;

7. (3) the balance between the harm the plaintiff will face if the injunction is denied and the harm the

8. defendant will face if the injunction is granted; and

9. (4) any effect the injunction may have on the public interest.

10. *Id.* at ¶ 20. "Alternatively, a court may issue a preliminary injunction if the moving party

11. demonstrates either a combination of probable success on the merits and the possibility of

12. irreparable harm, or the existence of serious questions going to the merits and a balance of

13. hardships tipping in its favor." *Id.*

14.      Rules 56(a) and 56(b) allow a motion for summary judgment on a claim "or any part

15. thereof." Rule 56(c) states that "[a] summary judgment, interlocutory in character, may be rendered

16. on the issue of liability alone." Summary judgment on a motion for declaratory relief is appropriate

17. upon a showing "that there is no genuine issue as to any material fact and that the moving party is

18. entitled to a judgment as a matter of law." *Id.* "Once the moving party establishes the absence of a

19. genuine issue of material fact, the burden shifts to the non-moving party to set forth admissible,

20. specific facts to show a genuine issue for trial." *Commonwealth Dev. Auth. v. Tenorio*, 2004 MP

21. 22 ¶ 9 (2004) (citation omitted). If, after determining whether the movant is entitled to succeed on

22. its summary judgment pursuant to Rules 56(a) and (c), the Court does not grant all the relief

23. requested, the Court then considers whether an order in accordance with Rule 56(d) will be

beneficial. *Warner v. U.S.*, 698 F.Supp. 877, 879 (S.D.Fla. 1988). The court may enter an order pursuant to Rule 56(d) which frames and narrows triable issues if it finds that such an order would be helpful to advance the progress of the litigation. *Id.*

The Court's findings on a preliminary injunction motion do not necessarily establish the law of the case with respect to the summary judgment motion. *See Wilcox v. United States*, 888 F.2d 1111, 1114 (6th Cir.1989) ("Because of the lesser burden of proof required to support a motion for preliminary injunction as contrasted with a motion for summary judgment, a trial court's disposition of the substantive issues joined on a motion for extraordinary relief is not dispositive of those substantive issues on the merits."); *University of Texas v. Camenisch*, 451 U.S. 390, 395, 68 L.Ed.2d 175, 180 (1981) ("findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits"); *Computer Associates Int'l, Inc. v. State Street Bank*, 789 F.Supp. 470, 478 D.Mass.,1992 (likelihood of success on merits did not have to be 50% for litigant to obtain preliminary injunction).

Correspondingly, the denial of a preliminary injunction motion does not guarantee the granting of an opponent's summary judgment motion. *Technical Publishing Co. v. Lebhar-Friedman, Inc.*, 729 F.2d 1136-39 (7th Cir. 1984). Further, where plaintiffs fail to demonstrate a reasonable likelihood of success on the merits on one issue, it does not follow that they have failed to state a cause of action. *Id.*

Because "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits," *Camenisch*, 451 U.S. at 395, the Court may consider evidence that would not necessarily be admissible in a summary judgment motion.

Witnesses who submit declarations in support of a preliminary injunction are subject to cross-examination by the opponents of the motion, even if they would not be entitled to do so on a summary judgment motion. *See, e.g., Visual Sciences, Inc. v. Integrated Communications Inc.*, 660 F.2d 56 (C.A.N.Y. 1981) (order granting preliminary injunction in stockholder's derivative action was subject to being vacated where defendants were not given an opportunity to fully cross-examine plaintiff's witnesses and present evidence and where district court made no adequate findings of fact); *Forts v. Ward*, 566 F.2d 849 (2d Cir. 1977) (where essential facts are in dispute on a motion for a preliminary injunction, the opposing party must be afforded the opportunity to cross-examine the moving party's witnesses and to present evidence).

## IV.    ANALYSIS

Given that there is no significant business for the LLC to conduct at this point, the resolution of who is the manager of LLC is less important than the question of whether the Fund should be maintained in Court-protected accounts or distributed to Member-Defendants. The bulk of analysis will focus on the latter issue.

### A.    Preliminary Injunction

#### 1.    Status Quo

The status quo ante refers not simply to any situation before the filing of a lawsuit, but instead to "the last uncontested status which preceded the pending controversy," *GoTo.com, Inc. v. Walt Disney Co.* 202 F.3d 1199, 1210 (9th Cir. 2000). The Court agrees with Plaintiffs that under the status quo prior to the instant dispute, UMDA was the manager of LLC, and the Fund was as-of-yet undistributed. While UMDA's distribution of proceeds to selected LLC Members did not act to preserve the status quo, the Court finds that the status quo would be further upset by the complete distribution to all Members.

16

## 2.    Irreparable Harm

Defendants argue that because any harm can be remedied by money damages, Plaintiffs have not shown irreparable harm. Plaintiffs counter that they will be irreparably harmed if the Fund is allowed to leave the Commonwealth, as this would decrease any chance of recovery should they prevail on this lawsuit.

In *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 340 (1999), the U.S. Supreme Court held that a preliminary injunction could not be issued to prevent a defendant from disposing of assets pending adjudication of an unsecured creditor plaintiff's contract claim for money damages.

In *Kevin Int'l Corp. v. Superior Court*, 2006 MP 03, also a contract dispute, the CNMI Supreme Court considered *Grupo Mexicano* and held that, "as a general rule, when a party is entitled to a remedy at law, no preliminary injunction should issue." *Id.* at ¶ 17. The Court explained, "Absent any evidence to the contrary, this Court will not assume a party will entirely leave the jurisdiction or become insolvent." *Id.* at ¶ 18.

The instant case is slightly different from *Grupo Mexicano* and *Kevin*, as it is not based on a breach of contract and there is no creditor who agreed to entrust a debtor with a sum of money. Rather, it is an attempt to maintain control over proceeds to which Defendants have title following their alleged tortious and potentially criminal misappropriation of the investment money. This difference affects the Court's willingness to apply the *Grupo Mexicano* reasoning. *Cf. Villanueva v. Tinian Shipping and Transp., Inc.*, 2005 MP 12 (declining to follow *Grupo Mexicano* in a case involving the government's claim for taxes).

Unlike *Kevin*, the Defendant-entities do not exist in the CNMI, and Defendants have not offered to put up a bond with the court to protect Plaintiffs' interests. Further, Plaintiffs have

17

provided some evidence suggesting that funds distributed to Defendants may be difficult to recover.[11]

If the Fund is distributed and Plaintiffs' allegations prove to be correct, the ultimate victims will be thousands of Micronesian shareholders that would be forfeiting their earnings to parties who improperly acquired UMDA stock and seized corporate opportunities. If the Fund remains in place, Defendants will suffer limited harm, as the Fund is currently collecting interest. On balance, UMDA is more likely to suffer irreparable harm than Defendants if the Fund is distributed.

### 3. Merits

At this early stage, it is unclear which side will prevail on the merits of the claims of the case. While Plaintiffs provided compelling evidence of misappropriations of UMDA funds on the part of Pfaff and certain other Defendants, Plaintiffs have not shown that money defrauded from UMDA was used by Member-Defendants for their investment in LLC. Nevertheless, evidence (or lack thereof) regarding the source of Member-Defendants' investment capital raises serious questions. More discovery is needed to clarify these matters.

### 4. Public Interest

Now that there are no remaining obligations under the Kumho sales agreement and nothing for the LLC manager to do, it matters little to the public whether Dingee or UMDA is the manager. Of greater significance is the reputation of the CNMI with respect to whether it is a safe place to invest money. Defendants argue that, if the provisions of LLC Act and the Operating Agreement can be disregarded here as urged by UMDA, and the members' investment and profits converted to UMDA's property, foreign investment in the CNMI will be discouraged. On the other hand, if

---

[11]  *E.g.*, April 27, 2007 email from Defendant McCall (UMDA's previous attorney) to Defendants Pfaff, Larson, and Dingee (Bellas SJ Opp. Dec. Ex. 6) and Dingee's Deposition at 97:13-17; 113:10-20 (Ex. 1). The Court also considers Pfaff's and other Defendants' apparent competence in moving money so as to avoid government notice. *See* U.S. Attorney General's Briefing in U.S. v. Stein (Ex. 14 Bellas's Declaration Opp SJ).

1. Plaintiffs' allegations regarding Defendants' misappropriations prove true, the CNMI and local
2. investors stand to benefit from Plaintiffs' prosecution of Defendants' alleged wrongdoing. At this
3. point, public interest factors do not favor either side.

4.     **5.    Balance of Hardships**

5.     The LLC (as opposed to its individual members) is not subject to any hardship regardless of
6. the outcome of this case, since it no longer has a purpose. If UMDA prevails but is unable to collect
7. on a judgment against Defendants (because assets have been removed/depleted), it will be subject to
8. hardship. If Defendants prevail, they will have suffered the hardship of not having had access to
9. their proceeds for the duration of the suit. They would be compensated to some extent by interest
10. that is currently accumulating on the Fund. On balance, UMDA stands to lose more by a timely
11. distribution than Defendants stand to lose by a delayed distribution.
12.  

13.     Based on the status quo, the potential for irreparable harm, and the balance of hardships, a
14. preliminary injunction maintaining UMDA as manager and preserving the Court-protected
15. certificates of deposit containing the Fund is appropriate.

16. **B.    Summary Judgment[12]**

17.     Based solely on the language of the SAOA, the TRO concluded that Defendants' removal of
18. UMDA had had not necessarily been improper. Since the issuance of the TRO, evidence introduced
19. by Plaintiffs has raised serious questions regarding the legitimacy of the LLC Members and their
20. action. At this time, there are too many unresolved questions of fact for the Court to determine
21. whether Dingee or UMDA is the manager.
22.  
23.  
24.  

---

25. [12]    The Court considers the "issue" of who is the manager of UMDA to be substantially similar to Plaintiffs'
Twelfth Cause of Action regarding the propriety of Members' actions to remove UMDA as manager. Thus, the Court
26. disregards Plaintiffs' arguments regarding the ability of the Court to decide summary judgment regarding an "issue"
rather than a "claim."

### 1.    Initial Briefing on Summary Judgment Issues

Plaintiffs' opposition argues that summary judgment is improper because fact questions (and legal questions) exist as to whether Member-Defendants are the legitimate owners of their shares, and the Operating Agreement is subject to rescission on grounds of fraud and misuse. *See* FAC ¶¶ 92-95. The complaint alleges that Defendants Pfaff, McCall, and Irizarry & McCall owed Plaintiffs' fiduciary duties and violated those duties.   (FAC ¶¶ 96-99, 109-116.)   Plaintiffs' opposition introduces evidence of such violations with respect to Pfaff. (Snow SJ Opp. Dec. ¶ 25-35.) Further, Plaintiffs note that the Operating Agreement requires "each Equity Owner" to "confirm[] to the Company that such Equity Owner is acquiring the Ownership Interest fro [sic] such Equity Owner's own account...." (¶ 13.17). Plaintiffs suggest that funds from different members may have come from the same source.[13]

Plaintiffs' opposition also questions the legitimacy of the Notice, noting that at Dingee's deposition, the only signatures he could authenticate in the memo were his and McCall's (for Monte Perucho), which together account for less than 15% of the members.  (Bellas SJ Opp. Dec. Ex. 1 at 107:15-111:24.)   Dingee was unable to identify whether any signatory, except himself, had the authority to act on behalf of the entity for whom the signatory supposedly was signing.  (*Id.*).

In the various operating agreements, UMDA (or Grandinetti) accepted the signatures of trustee Thomas Sorenson for GET Realty, Brian Bigelow for Sasquatch II, and Paul Dingee. Defendants argue that UMDA is estopped from denying the validity and authority of signatures, since it accepted these signatures as valid and authentic when members submitted their investment and proceeded to accept the benefit of the investors' money. *See Ullman, Perlmutter & Sklaver v.*

---

[13]    Plaintiffs attempt to introduce evidence suggesting that Original Member KCT Irrevocable Trust and Current Member GET Realty Irrevocable Trust share an account, although the account numbers on the Court's copy of this document appear to be different by one digit. (Snow SJ Opp. Dec. ¶ 18 & Exs. 7-8.)

1.   *Byers*, 96 Conn.App. 501, 506, 900 A.2d 602 (2006) ("parties cannot accept benefits under a

2.   contract fairly made and at the same time question its validity"); *Common Wealth Ins. Systems, Inc.*

3.   *v. Kersten* 40 Cal.App.3d 1014, 1028; 115 Cal.Rptr. 653 (1974) (where a bank shareholder

4.   discovered that his signature on a promissory note had been forged but knowingly accepted the

5.   financial benefits from the loan, he was estopped from denying the validity of his signature). If

6.   Grandinetti acted outside of his authority in accepting the signatures, however, estoppel may not

7.   apply.

8.

9.   **2.      The Dispute Regarding Affidavits**

10.          In response to Plaintiffs' opposition, Dingee submitted a reply containing unnotarized

11.   declarations regarding the validity of signatures on the Notice. The declaration of Angelina Irizarry,

12.   Manager of Tapia America LLC (the company that owns and manages Monte Pechuro), submitted

13.   an affidavit authorizing the signature of McCall on behalf of Monte Pechuro. Brian Bigelow, the

14.   partner of Sasquatch, submitted an affidavit authorizing his signature for Sasquatch. Thomas

15.   Sorenson also submitted an affidavit reaffirming his authority to sign for GET Realty. Brian

16.   Bigelow's declaration stated under the penalty of perjury, "I declare that the foregoing is true and

17.   correct under penalty of perjury under the laws of the Commonwealth of the Northern Mariana

18.   Islands." Sorenson's declaration stated that he was "duly sworn pursuant to the laws of the state of

19.   Wisconsin" and that he declared "under the penalty of perjury that the foregoing is true and

20.   correct." Dingee's declaration stated that he was duly sworn and that he verified "that the foregoing

21.   statements are true and correct and are personally known to me." Irizarry's affidavit stated that she

22.   was "duly sworn pursuant to the laws of the State of Colorado" and that her declarations were

23.   "under penalty of perjury."

24.

25.

26.

21

1. In an August 13, 2007 sur-reply and at the August 14, 2007 hearing, Plaintiffs noted that

2. declarations of Dingee, Sorenson, Irizarry, and Adams in support of Dingee's motion for partial

3. summary judgment were submitted with Defendants' reply rather than with the summary judgment

4. motion. Plaintiffs argued that this unfairly prevented them from timely responding. Plaintiffs also

5. objected to the use of the declarations in conjunction with the preliminary injunction, since they

6.

7. were only captioned as support for a reply to the opposition for summary judgment.[14] Plaintiffs

8. argue that Rule 6(d)(1) required the affidavits to be served at the same time as the original motion

9. or reply.[15]

10. The Court agrees with Plaintiffs that the majority rule is that new arguments for summary

11. judgment may not be made in a reply brief.[16] Nevertheless, courts may decline to strike affidavits

12. filed in a reply brief where affidavits address matters raised in an opposition brief and do not

13. introduce new factual or legal issues. *E.g.*, *Cardenas v. Dorel Juvenile Group, Inc.*, 230 F.R.D. 635

14. (D. Kan. 2005) (admitting into evidence a supplemental declaration filed in advance of the hearing

15. on the motion where opponents did not establish that they have been prejudiced in any way).

16.

17.

18.

19. [14]  Dingee asserts that the declarations were filed both in support of the motion for to summary judgment and the opposition to the preliminary injunction. This is actually not the case. The declarations were referenced only once in the "Reply of Paul Dingee in Support of Motion for Partial Summary Judgment," and the declarations themselves state only

20. that they were prepared in conjunction with Dingee's partial summary judgment motion.

21. [15]  "When a motion, opposition, or reply is supported by affidavit, the affidavit shall be served with such motion, opposition, or reply." Com R. Civ. Pro. Rule 6(d)(1).

22. [16]  *See Batista v. Santiago*, 25 A.D.3d 326, 807 N.Y.S.2d 340 (1st Dept.2006)(to meet its prima facie burden,

23. summary judgment movant could not rely on evidence submitted for the first time in its reply papers); *Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir.1999) ("new arguments may not be made in a reply brief.")

24. *Payne v. Giant Food, Inc.*, 346 F. Supp. 2d 15, 21 n. 4 (D.D.C. 2004) ("These facts were raised for the first time in petitioner's reply ... petitioner's 'effort in his reply brief to meet his burden . . . comes too late.'") (citing *U.S. v. Wilson*, 240 F.3d 39, 45 (D.C. Cir. 2001)); *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 682 (S.D. Cal. 1999) ("It is well

25. accepted that raising of new issues and submission of new facts in [a] reply brief is improper.") (citing *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996)); *Contratto v. Ethicon Inc.*, 227 F.R.D. 304, 309 n.5 (N.D. Cal. 2005)

26. (collecting cases) (holding "Defendants' attempt to introduce new evidence in connection with their reply papers is improper" and striking new evidence submitted with reply).

22

Here, Plaintiffs raised the issue of authenticity and validity in their opposition to the summary judgment motion, filed July 25, 2007. Dingee's reply affidavits, filed August 6, 2007 (seven days before the hearing) addressed this argument. *See McGinnis v. Southeast Anesthesia Assocs.*, 161 F.R.D. 41, 42n.1 (W.D.N.C.1995) (allowing affidavits to accompany reply because they supported reply brief). Plaintiffs were not prevented from addressing the reply affidavits. Plaintiffs filed a sur-reply entitled "Plaintiffs' Objection to 'Reply Affidavits' Improperly Submitted by Defendant Paul C. Dingee" on the afternoon of August 13, 2007, which the Court took into consideration.

Plaintiffs also objected to the validity of the declarations, as they were not notarized, sworn under penalty of perjury, or executed in the CNMI or under penalty of perjury under the laws of CNMI. Plaintiffs objected to the incompleteness of declarations, noting that each declarant stated that he or she was "authorized to sign" or to "take action" as to entities without revealing the documentary or legal support for this hearsay assertion. *See, e.g.,* ¶ 5 of Angelina Irizarry's declaration. Plaintiffs assert that failure to include such documentation is a violation of the hearsay and best evidence rules. *See* Com. R. Evid. 801, 802 (hearsay); 1002 (best evidence rule).

After business hours on the day before the August 14, 2006 hearing, in response to Plaintiffs' sur-reply, Dingee submitted revised declarations. Irizarry's revised declaration appears identical to the first one, except it is notarized. Bigelow's and Sorenson's revised declarations are also the same, except the signature dates are updated and the signatures are notarized. Paul Dingee did not have his July 27, 2007 declaration notarized, although he resubmitted a previously made notarized document.

At the August 14, 2007 hearing, Plaintiffs objected that even the notarized declaration of Angelina Irizarry was invalid because the date of notarization did not match the date of her

1. signature, the declaration was not made under the penalty of perjury under CNMI law as required

2. by 7 C.M.C. § 3305,[17] and the declaration fails to state the place of signature. Plaintiffs further

3. object that the information in the affidavits was the same information that Dingee refused to provide

4. when questioned at his deposition.

5.    On August 16, 2007, Plaintiffs submitted a supplemental objection to the affidavits, which

6. the Court took into consideration.

7.

8.    While the Court may consider inadmissible affidavits in a preliminary injunction

9. proceeding, *Federal Savings & Loan Insurance Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir.1987),

10. the court cannot consider for purposes of summary judgment declarations do not comply with 7

11. C.M.C. §§ 3305 and 3307.[18] The Court will consider the revised, notarized declarations for

12. summary judgment, since it also considered Plaintiffs' post-argument brief objecting to the

13. notarized declarations.

14.    Plaintiffs raise various concerns regarding the notarized affidavits. None of them state where

15. they were signed, although all but Dingee's refer to state law of perjury.  As discussed above,

16. Irizarry's "revised" affidavit is simply the affixation of a notary seal on the same document, without

17. a revision in date. Dingee argues that the Notaries Public Act, 4 CMC §§ 3311-3326, does not

18.

19.

20. [17]    Plaintiffs' supplemental brief notes that Dingee's affidavit lacks any statement that his statements are "under penalty of perjury" in any jurisdiction. *See* 7 C.M.C. §§ 3305, 3307 (requirements for an affidavit); *Chou Mitsui Trust & Banking Co. v. Guerrero*, CNMI Super. Ct. Civ. Action No. 00-0279D, at 9-13 (Order Following Oral Ruling

21. Granting Motion to Strike for Sanctions and Motion for Summary Judgment, Oct. 25, 2002) (striking affidavits and exhibits that failed to comply with CNMI law).

22. [18]    *See* Com. R. Civ. P. 56(e): "Supporting and opposing affidavits shall be made on personal knowledge, shall set

23. forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."; *Chou Mitsui Trust & Banking Co. v. Guerrero*, CNMI Super. Ct. Civ. Action No. 00-

24. 0279D, at 9-13 (Order Following Oral Ruling Granting Motion to Strike and for Sanctions and Motion for Summary Judgment, Oct. 25, 2002) (striking affidavits and exhibits that failed to comply with CNMI law); *see also Orr v. Bank of Am. NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("court can only consider admissible evidence in ruling on a motion

25. for summary judgment"); *Carmona v. Toledo*, 215 F.3d 124, 131 (1st Cir. 2000) (documents that were not properly authenticated pursuant to language of rule 56 could not be considered on summary judgment); *Myxer v. Emark Corp.*,

26. 45 Cal. App. 4th 844, 890 n.4 (1996) (attempting to verify cross-complaint "under penalty of perjury under the laws of the State of Illinois" failed to verify cross-complaint under California law as required).

1. mandate that all notary acknowledgments must be affixed concurrently with the affiant's signature.

2. Said act does not discuss signature requirements, however, but requirements for notaries. The Court

3. finds that the date inconsistencies as well as the language of Irizarry's affidavit (there is not a line at

4. the end verifying that it is true) make it inadmissible.

5.     **3.**    **Plaintiff's Supplemental Briefing Concerning Depositions**

6.       On August 20, 2007, Plaintiffs submitted "Plaintiff's supplemental objection to Motions for

7. Summary Judgment filed by Dingee, Sasquatch, Monte Pechuro, and Pfaff" based on the CNMI

8. Supreme Court Justice Castro's August 9, 2007 decision from the bench to revoke defense counsel

9. Russell Murray's pro hac vice admission to the CNMI bar, and Justice Castro's August 17, 2007

10. written decision denying the pending application of defense counsel David York. *See In Re the*

11. *Application for Pro Hac Vice Admission of David A. York*, Supreme Court No. 2007-ADM-0024-

12. PHV, Order Denying Applicant Pro Hac Vice Admission.

13. 

14.       Justice Castro found that defense counsel engaged in the unauthorized practice of law when

15. they appeared at Dingee's July 2007 deposition without having been admitted to the CNMI bar. *Id.*

16. at ¶ 5. Plaintiffs note that this Court warned of possible sanctions against Dingee for noncompliance

17. with his deposition notice, and argue that Dingee was noncompliant because he followed defense

18. counsel's instructions not to answer questions. Plaintiffs assert that as a sanction for defense

19. counsel's misconduct, Dingee's summary judgment motion should be denied. *See* Com. R. Civ.

20. Proc. 37(b)(2), (d); *see also In re Marino*, 193 B.R. 907, 909 (9th Cir. B.A.P. 1996) (court denied a

21. motion and disallowed the introduction of evidence as a sanction for repeated noncompliance with

22. the court's pre-trial orders); *Great N. Storehouse, Inc. v. Peerless Ins. Co.*, 2000 WL 1901266, *1-3

23. (D. Me. 2000) (preventing admission of evidence as sanction for withholding discovery).

24. 

25. 

26.

1.       Dingee and Pfaff moved to strike as untimely an uncalled for Plaintiffs' August 20, 2007

2. supplemental briefing. Dingee argues that the supplemental briefing violates the deadline for filing

3. an opposition set forth in Rule 6(d) ("Any opposition to the motion shall be filed and served not

4. later than nine calendar days after service of the motion."). Supplemental briefs are not permitted

5. for except by court order, and Plaintiffs have not requested leave for additional briefing. Plaintiffs'

6. opposition to the motion to strike argues that the Court has a right to accept supplemental briefing

7. from the parties at any time.[19]

8.

9.       The supreme court's decision said nothing about defense counsels' behavior at the

10. deposition with respect to blocking questions. Plaintiffs were aware that defense counsel were not

11. admitted to the CNMI bar prior to the supreme court's decision. Thus, prior to the August 14, 2007

12. summary judgment hearing, plaintiffs could have made their argument for the denial of summary

13. judgment as a sanction for noncompliance with the deposition.[20] Alternatively, Plaintiffs could have

14. raised the issue in an appropriately captioned motion. Thus, the Court declines to consider

15. Plaintiffs' August 20, 2007 brief for purposes of this decision.

16.      **4.**     **Post-August 13, 2006 Joinders in Dingee's Summary Judgment Motion**

17.

18.

19. [19]   *See Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1296 (D.C. Cir. 2007), and

20. that supplemental briefing is justified where necessary to inform a court of developments in the law or facts related to issues under advisement. *See id.; see also, e.g., Kircher v. City of Ypsilanti*, 458 F. Supp. 2d 439, 441 (E.D. Mich.

21. 2006) ("These motions have been fully briefed by the parties, including the submission of various supplemental briefs that are principally directed at subsequent developments in the ongoing state court litigation."); *cf. Bank of Saipan v.*

22. *Superior Court (Disqualification of Lamorena)*, 2002 MP 17 ¶¶ 21-22 (considering arguments raised for the first time in reply and sur-reply because "justice and fairness require[d] their consideration").

23. [20]   It is not clear that outright denial of summary judgment is the appropriate remedy for noncompliant affidavits.

24. Commonwealth Rules of Civil Procedure 56(g) provides the remedy for affidavits made in bad faith:" the court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses which the

25. filing of the affidavits caused the other party to incur, including reasonable attorneys' fees, and any offending party or attorney12 may be adjudged guilty of contempt." The *Chou Mitsui Trust* court applied this remedy where Defendants'

26. affidavits and exhibits flatly contradicted Defendants' sworn discovery responses to interrogatories and requests for production specifically designed to reveal the sort of material later presented by Defendants in opposition to summary judgment.

After the August 13, 2007 hearing, Defendants Monte Pechuro and Sasquatch filed motions for summary judgment identical to Dingee's. Sasquatch also filed a motion to dismiss Plaintiffs' twelfth cause of action, which (as Plaintiffs acknowledge in their opposition) is basically the same as Pfaff's motion to dismiss the twelfth cause of action/motion for summary judgment on the same issue that is the subject of the instant summary judgment motion.

Plaintiffs object to joinders/new motions on the same issues already argued August 14, 2007. The Court finds the objections as well as the joinders/motions themselves irrelevant, as the Court's decision on Dingee's summary judgment motion will affect all Defendants similarly, obviating the need for any of the supplemental motions and joinders.

Until the instant litigation, Plaintiffs have done little to ascertain the identities of the "Pfaff group." Since the initiation of litigation, affidavits and briefing filed by Defendants have done little to clarify these identities. Thus, while Member Defendants appear to have followed the language of the SAOA in removing UMDA as manager of LLC, there remain unresolved questions of fact regarding the legitimacy and authenticity of the Defendants' actions. Accordingly, summary judgment on the issue of management (and on Plaintiffs' Twelfth Cause of Action regarding the same question) is premature.

## V.    CONCLUSION

While the Court applies different standards to the determination of motions for a preliminary injunction and for summary judgment, in this case, both motions are resolved in Plaintiffs' favor. Plaintiffs have shown sufficient evidence to allow the Court to conclude that the harm UMDA is likely to suffer if the Fund is distributed is greater than that which Defendants are likely to suffer if the Fund remains in place. Although the determination of who is the manager of LLC is no longer as important as it was previously, the Court now concludes that it is appropriate to maintain the

27

1. status quo ante in which UMDA served as manager. Plaintiffs' motion for a preliminary injunction
2. is hereby GRANTED until further notice.
3.        Plaintiffs have also met their burden of showing disputes of fact regarding the composition
4. of various Members and the source of their funds. Thus, summary judgment on the issue of who is
5. the UMDA manager (or on Plaintiffs' Twelfth Cause of Action), is inappropriate at this time, and
6. Dingee's motion is hereby DENIED.
7.
8.
9.        SO ORDERED this 13th day of November, 2007.
10.
11.
12.                                              _____
                                                Juan T. Lizama
                                                Associate Judge, Superior Court
13.
14.
15.
16.
17.
18.
19.
20.
21.
22.
23.
24.
25.
26.

28