# EXHIBIT 24

1 | Colin M. Thompson, Esq.
THOMPSON LAW OFFICE, LLC
2 | J.E. Tenorio Building
PMB 917 P.O. Box 10001
3 | Saipan, Mariana Islands 96950
Telephone: (670) 233-0777
4 | Facsimile: (670) 233 0776

5 | **OVERLAND BORENSTEIN SCHEPER & KIM LLP**
MARK A. BORENSTEIN (admitted *pro hac vice*)
6 | mborenstein@obsklaw.com
300 South Grand Avenue, Suite 2750
7 | Los Angeles, CA 90071-3144
Telephone:   (213) 613-4655
8 | Facsimile:   (213) 613-4656

9 | **Attorneys for Robert Pfaff**

10

11 | SUPERIOR COURT OF THE

11 | COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

12

13 | 
UNITED MICRONESIA DEVELOPMENT
14 | ASSOCIATION, INC., and UMDA LAOLAO
LLC,
15 | 
Plaintiffs,
16 | 
v.
17 | 
ROBERT PFAFF, et al,
18 | 
Defendants.
19 | 

CASE NO. 07-0152

**ROBERT PFAFF'S MEMORANDUM OF
POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFFS'
MOTION (1) TO COMPEL DOCUMENTS
RELATING TO PFAFF'S ENTITIES, (2)
TO COMPEL ANSWERS TO
DEPOSITION QUESTIONS, AND (3) TO
PROHIBIT PFAFF FROM OBTAINING
DISCOVERY FROM PLAINTIFFS;
DECLARATION OF MARK A.
BORENSTEIN IN SUPPORT THEREOF**

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................. 1

II.    PROCEDURAL HISTORY ........................................................................... 3

     A.     Origins of UMDA's Claims ............................................................. 3

     B.     UMDA's Allegations Against Mr. Pfaff. ....................................... 4

           1.     UMDA's Complaint Articulates No Details of the Alleged Misconduct ........................................................................ 4

           2.     UMDA's Business Records Reveal That UMDA's Claims Have No Merit ............................................................................... 5

     C.     UMDA Capitalizes on the Criminal Investigations ........................ 7

           1.     The Stein Indictment ........................................................ 8

           2.     The Pfaff Indictment ........................................................ 9

           3.     The Attorney General's Investigation .............................. 10

III.   LEGAL ANALYSIS ...................................................................................... 11

     A.     Standards Governing Assertion of the Fifth Amendment ................. 11

     B.     UMDA's Questions Unequivocally Raise Subjects Protected by the Privilege ...................................................................................... 12

           1.     Purported Misappropriation of UMDA Shares .............................. 13

           2.     Purported Misappropriated Corporate Opportunities ..................... 15

           3.     Transactions Specifically Mentioned by Prosecuting Authorities .............. 15

           4.     Entities Specifically Mentioned in By Prosecuting Authorities ................. 16

     C.     UMDA's Attempt to Misuse The Collective Entity Doctrine Is Unavailing .......... 17

           1.     The Collective Entity Rule Does Not Apply to Individuals ........................ 17

           2.     UMDA Has Not Requested Documents From Mr. Pfaff as a Custodian ................................................................................ 20

     D.     UMDA Effort to Thwart Obviously Relevant Document Production Is Completely Unfounded and Unsupported by Any Authority ...................... 21

IV.   CONCLUSION ............................................................................................... 24

## I.    INTRODUCTION

Plaintiff United Micronesia Development Association, Inc.'s ("UMDA") motion to compel is premised on two deceptions, both concerning what UMDA and its lawyers have *failed* to tell the Court...First, UMDA challenges Defendant Robert Pfaff's Fifth Amendment privilege, arguing that there is no basis for the invocation as to hundreds of deposition questions and many document requests, but concealed the details of the CNMI Attorney General's criminal investigation into the exact same transactions as UMDA challenges in this case. UMDA also ignored the specific allegations in the two indictments pending against Mr. Pfaff in the Southern District of New York. Even a cursory examination of the allegations in these three proceedings demonstrate that UMDA's motion is beyond baseless. Indeed, the federal judge in one of the criminal cases in New York, when considering the Fifth Amendment's application to related civil cases, stated that the criminal defendants "would be crazy" if they did not invoke the Fifth Amendment privilege, and if the defendants did not, "their lawyers would be guilty of malpractice." *See Klamath Strategic Investment Fund v. United States*, M-85 (LAK) (S.D.N.Y, July 24, 2006) at 16:24-17:5 (Judge Kaplan), attached to the Declaration of Mark A. Borenstein, at Ex. I.

UMDA's failure to even mention the criminal proceedings facing Mr. Pfaff is quite telling. At every other opportunity in this case, UMDA has waved the indictments as evidence of Mr. Pfaff's wrongdoing concerning UMDA and co-Plaintiff UMDA LaoLao, LLC (the "LLC"). UMDA's histrionics have sought to create the impression that Mr. Pfaff and his family and business associates are bad people who must have done something wrong concerning UMDA. In fact, UMDA's strategy has been to introduce a litany of innocuous – or at times completely fabricated – alleged acts by Mr. Pfaff, and then use the criminal proceedings as "evidence" of civil tort liability.[1]

But UMDA cannot have it both ways. UMDA cannot reference the indictments in the criminal cases (which are not evidence, of course) to support its unfounded allegations, and then

---

[1] Significantly, there is no claim in the criminal indictments that UMDA or anyone other than the IRS, lost even a penny or was damaged in any way.

1  pretend them away when it seeks discovery from Mr. Pfaff. Having trumpeted the criminal

2  indictments at every turn and having worked with the Attorney General to manufacture a very real

3  and tangible risk of criminal prosecution in the CNMI, UMDA cannot now assert in good faith

4  that the information relevant to that investigation is not subject to the Fifth Amendment privilege.

5  To the contrary, UMDA's (and its counsel's) conduct should be sanctioned for wasting the Court's

6  and parties' time and money under Rule 37(a)[2]

7        Second, UMDA has failed to disclose to the Court that the very documents UMDA's so-

8  called "protective order" seeks to shield from disclosure were produced by UMDA to the US

9  Attorney's office in NY, and they show that UMDA's claims are wholly meritless. And UMDA's

10  lawyers and directors know it.[3]

11        The central contention in UMDA's first amended complaint that purportedly justifies

12  relief against Mr. Pfaff and wide ranging discovery by UMDA into years of private business and

13  banking transactions is the claim that Mr. Pfaff converted or misappropriated UMDA property

14  and money that was later used to buy UMDA stock and invest in the LLC.  UMDA has steadfastly

15  refused to provide any information supporting these allegations of theft and conversion; indeed, it

16  has completely refused to identify precisely what money and property Mr. Pfaff allegedly

17  improperly took! Without this proof, UMDA has no case; it matters not how or in what way Mr.

18  Pfaff acquired, used or transferred his money and property among different bank accounts or

19

20  [2] UMDA's assertion that Mr. Pfaff cannot assert the privilege concerning documents in his
possession that relate to certain entities is also unfounded. The "collective entity doctrine" cited by
21  UMDA applies only when the document request or subpoena seeks documents from a current
custodian of records, which are held in his official capacity as a representative of the entity.
22  UMDA has not even attempted to serve such a subpoena on Mr. Pfaff as custodian, but instead
seeks papers held by him in his personal capacity. Indeed, UMDA has sent document requests to
23  the actual custodians of records for at least some of the entities in question.

24  [3] UMDA's request for a court order allowing UMDA completely to shirk its discovery obligations,
25  and thereby preventing Mr. Pfaff from defending, is wholly unsupported by any case, statute or
rule. *See e.g* Wright and Miller, 8 *Federal Practice & Procedure* § 2018 n. 46 (2008)(citing
26  cases)(to foreclose a criminal defendant "from litigating an issue properly in the case, merely for
claiming the constitutional privilege certainly makes the resort to the privilege too 'costly' [and it]
27  is difficult to believe that sanctions of this kind can be defended.")

28

2

1  entities, if UMDA cannot or will not identify and produce evidence of the UMDA property

2  actually taken. By seeking relief from its own discovery obligations which now formally require

3  UMDA to describe what was allegedly taken by Mr. Pfaff and his family, UMDA seeks to

4  continue misusing the Saipan litigation.[4]

5          While UMDA's complaint is devoid of any specific factual claims, UMDA's lawyers and

6  directors identified three specific transactions, the so called "CNB note," the purchase of 35,000

7  shares of UMDA stock and the investment in the LLC, at the November 2007 preliminary

8  injunction hearing before Judge Lizama. As shown below, the documents UMDA and its lawyers

9  provided to the United States Attorney show that each of these claims is completely baseless.

10  Indeed, since the documents must have been reviewed by UMDA's lawyers before they were

11  produced to the government, the questioning by UMDA's lawyers at the injunction hearing likely

12  induced knowingly false testimony and violated Rule 11.

13          By granting a protective order, the Court will allow UMDA to perpetuate its deception.

14  Irrespective of Mr. Pfaff's Fifth Amendment rights, the very documents already produced in New

15  York, must now be produced in Saipan.

16  **II.    PROCEDURAL HISTORY**

17          **A.    Origins of UMDA's Claims**

18          In 2004, UMDA formed the LLC as an investment vehicle to purchase shares of a

19  corporation that operated a golf course located in the Commonwealth of the Northern Mariana

20  Islands ("CNMI"). (First Amended Complaint ("FAC") ¶¶ 60-64.)[5] UMDA invited other investors

21

22  [4] UMDA's strategy may be to use Mr. Pfaff's proper invocation of the Fifth Amendment, to

23  request the Court to draw negative inferences in UMDA's favor. Before finding that UMDA is
    unfairly disadvantaged by the privilege, the Court will need to consider a myriad of issues

24  including whether the information UMDA seeks is available elsewhere. Most of the information
    sought is already in UMDA's possession, but any information it lacks can be obtained from third

25  parties, like former UMDA CEO Michael Grandinetti, and former UMDA President Peter Sinclair
    (individuals whose alleged wrongdoing is expressly defined in UMDA's complaint, but who are

26  curiously omitted from the list of defendants). According to UMDA's directors, both Grandinetti
    and Sinclair are "cooperating" with UMDA.

27
    [5] Although the First Amended Complaint has been dismissed, UMDA has so far refused to file a

28  (footnote continued)

3

1   to purchase an interest in the LLC, and Mr. Pfaff – who was a director at the time – solicited funds

2   for the investment from business associates and entities. (*Id.*, see also ¶ 58.) In addition, several

3   other UMDA board members also invested in the LLC. (*See* FAC Ex. A.) After the LLC sold its

4   primary asset, a minority interest in the LaoLao Golf Course, and essentially doubled its members'

5   investment, UMDA decided to keep the profits (and principal) from the majority of the members

6   for itself. (*See generally* FAC.)

7   **B.    UMDA's Allegations Against Mr. Pfaff**

8       *1.    UMDA's Complaint Articulates No Details of the Alleged Misconduct*

9   Since UMDA's complaint is merely a creature of opportunism, and not a genuine request

10  for relief, it fails to articulate any details of Mr. Pfaff's wrongful conduct, and none of the

11  discovery conducted by UMDA has yet revealed any wrongdoing. Rather, UMDA brought the

12  instant case, asserting a variety of unspecified wrongs by Mr. Pfaff and others allegedly working

13  in concert with him. For example, UMDA claims that in 1996, Mr. Pfaff used payments he

14  received for providing UMDA tax advice through his former employer, KPMG,[6] along with

15  "subsequent questionable transactions," to "fraudulently obtain[] stock in UMDA." (FAC ¶¶ 53-

16  58.) Then Mr. Pfaff allegedly "used UMDA...to engage in a number of sophisticated transactions

17  apparently designed to hide illicit gains through, among other means, acquiring interests in

18  UMDA and related entities." (FAC ¶ 55.) The primary allegation of wrongdoing is in paragraph

19  118 of the FAC where UMDA alleges that Mr. Pfaff and others "effectively converted the assets

20  and resources of the corporation to their own uses at the expense of the Plaintiffs." Despite the

21  length of UMDA's 166 paragraph First Amended Complaint, these few paragraphs are the only

22  specific allegations in the entire complaint of Mr. Pfaff's alleged improper appropriation of

23  UMDA's property; there are no specific facts alleged concerning what UMDA property was taken

24

25  second amended complaint. Defendants have prepared and will file a motion to dismiss the action
    under Rule 41. Until then, the First Amended Complaint is cited herein.

26  [6] UMDA has thus far been unable to explain how it was injured by the tax strategy called "ZENS"
    Mr. Pfaff purported recommended, or even how any payments made to professionals were
27  improper. The tax transaction has *never* been challenged by the IRS.

28

4

1  by Mr. Pfaff.[7]

2       At the preliminary injunction hearing, UMDA's directors purported to explain in detail the

3  alleged misconduct that is *not specified in* it's the First Amended Complaint. Specifically, UMDA

4  Directors Russell Snow, Eduardo Calvo, Joshua Koshiba and Jose Lifoifoi identified three

5  supposed tortious acts by Mr. Pfaff: (1) the taking by Mr. Pfaff's children's trusts of UMDA's

6  corporate opportunity to buy 100% of the Lao Lao Golf Course, (2) the misappropriation

7  UMDA's corporate opportunity to refinance a $10 million loan from City National Bank to

8  UMDA, and (3) the purchase of 35,000 UMDA shares by the KCT Irrevocable Trust, whose

9  beneficiaries are Mr. Pfaff's children, allegedly in violation of UMDA's stockholder preemptive

10 rights. Significantly, other UMDA directors, including Calvo, Peter Sinclair, Michael Grandinetti,

11 Tony Gannigiyan and Snow participated in the investments on the same terms as Mr. Pfaff or the

12 trusts. Other directors also purchased UMDA stock the same manner as KCT.

13       **2.    *UMDA's Business Records Reveal That UMDA's Claims Have No Merit***

14       At the November 2007 preliminary injunction hearing, UMDA produced nothing to

15 substantiate the oral claims made by the UMDA directors, and has not produced any evidence

16 since then. Nor could it, because the documentary evidence *disproves* that Mr. Pfaff or anyone

17 related to him improperly took any corporate opportunities or acquired UMDA stock. UMDA

18 knows full well that this is the case, as it produced those exonerating documents to the United

19 States Attorney in connection with the criminal cases pending in New York.

20       Since the contentions in the two criminal cases overlap with and relate to UMDA's claims,

21 UMDA produced thousands of pages of documents to the U.S. Attorney's Office in New York in

22 response to a government subpoena. Mr. Pfaff's lawyers received these documents as part of the

23 government's criminal discovery obligations. Because an interim protective order does not permit

24 counsel to produce the documents for the Court's review that expressly contradict UMDA's factual

25 _____

26 [7] UMDA accuses Mr. Pfaff of "transferring assets" to "conceal tortious and/or illegal conduct
   and/or to evade taxes," but fails to describe any of the tortious or illegal conduct alleged. In any
27 event, Mr. Pfaff's alleged efforts to "evade taxes" himself cannot be a cause of injury to UMDA.

28

1  contentions, counsel offers the following information derived from the documents and urge the

2  Court to order UMDA to produce the documents forthwith.

3         The records UMDA has in its possession, and which its counsel must have reviewed

4  prior to production to the government, demonstrate that all of the specific contentions so far raised

5  are utterly baseless. For example, UMDA is well aware that the purchase of the LLC interest could

6  not possibly be a basis for any claim that Mr. Pfaff or his family usurped UMDA's corporate

7  opportunity. Not only did the UMDA Board expressly agree that it was too risky for UMDA

8  itself to buy 100% of the Lao Lao Golf Course at its November 2004 Board meeting, the Board

9  voted to allow UMDA board members and other shareholders (as well as others recommended by

10 the board members) to invest in the LLC – on a motion by Calvo that was seconded by Lifoifoi.

11 Calvo, along with Snow, Gannigiyan and Jones (a friend of Lifoifoi), invested in the LLC. When

12 the sale of the golf course was completed, UMDA did not hesitate to distribute the full share of the

13 initial investment and profits to these individuals. At the same time, UMDA, as the LLC's

14 manager, refused to distribute either the initial investment or profits to GET Realty Trust and other

15 off-island LLC investors. Surely, if GET usurped a corporate opportunity that should have been

16 reserved to UMDA, so did Calvo, Snow, Gannigiyan and Jones. Tellingly, UMDA has failed to

17 bring any claims against these individuals.

18         UMDA's documents are equally fatal to its allegations regarding the refinance the loan

19 from City National Bank ("CNB"). The directors at the preliminary injunction hearing testified

20 that UMDA should have been able to buy back the $10 million loan from CNB at a 70% discount

21 and capture the savings. They complained that a group of investors, including UMDA's chairman

22 and CEO, Michael Grandinetti, its president, Peter Sinclair, Mr. Pfaff and others, managed to buy

23 the loan at a discount, instead of UMDA. However, the documents that UMDA produced to the

24 government, but refuses to produce here, establish that (1) although UMDA attempted to borrow

25 the $7 million necessary to purchase the note, no traditional lenders would make the loan, (2) all

26 of the UMDA directors, including Lifoifoi, Snow, Calvo, Koshiba and Gannigiyan, were offered

27 the chance to participate in the buyout of the CNB loan, (3) Gannigiyan actually loaned

28 Grandinetti $250,000 so Grandinetti could participate in the CNB loan buyout, and (4) before

6

1  Grandinetti approved any refinancing of the loan, he insisted that UMDA be paid $750,000 as part

2  of the transaction – a sum that UMDA otherwise had no legal right to receive.

3      UMDA's directors also testified that the KCT Irrevocable Trust acted improperly when

4  it purchased 35,000 shares of UMDA in 2001. At the preliminary injunction hearing, the UMDA

5  directors seemed to contend that either UMDA was never paid for the 35,000 shares, or that KCT

6  should not have been able to buy the 35,000 shares because of preemptive rights in UMDA

7  Articles of Incorporation which purportedly prohibited the purchase of the stock. UMDA's

8  business records completely refute the claim, in three ways. First, they show that UMDA was

9  actually paid in full for these shares, at a record high price of $34.79 per share. Second, UMDA's

10  Board of Directors – in a motion by Koshiba and seconded by Gannigiyan – approved in 2000 a

11  plan fashioned by UMDA's corporate counsel to allow UMDA to hold shares in trust and then re-

12  sell them to interested investors, so as to avoid the preemptive rights provisions of the Articles of

13  Incorporation – a procedure that was followed when KCT purchased its shares in 2001. The same

14  procedure was seemingly later followed by other UMDA directors, including Calvo and

15  Koshiba, who also purchased UMDA stock.

16      It is unclear whether the directors who testified at the preliminary injunction were aware

17  that UMDA's own documents completely undercut its claims in this action. Perhaps they were

18  aware of the documents and evidence, and simply lied under oath. Or perhaps UMDA's counsel

19  deliberately concealed these documents from its clients in an effort to bolster the preliminary

20  injunction testimony. In either event, the documents that establish these facts refute UMDA's

21  shameful allegations, and must be produced in this action, just as they were to the U.S. Attorney.

22      **C.**    **UMDA Capitalizes on the Criminal Investigations**

23      With no actual evidence that Mr. Pfaff did anything to injure UMDA – or even that

24  UMDA suffered any detriment at all – UMDA could only misappropriate the LLC investment by

25  capitalizing on a criminal prosecution against Mr. Pfaff that is currently pending in the Southern

26  District of New York. Hoping that Mr. Pfaff would be unable to defend himself while facing both

27  a civil suit and criminal prosecution in New York, UMDA seized the moment to assert numerous

28  claims against Mr. Pfaff and numerous entities with which he has allegedly been associated. As

7

1   revealed in the First Amended Complaint, UMDA's legal strategy is to create a laundry list of
2   unrelated actions, allegedly taken by Mr. Pfaff and by others who are not under his control, and
3   then reference the indictment as "evidence" that Mr. Pfaff somehow injured UMDA. (*See, e.g.,*
4   FAC ¶¶ 88-90 (UMDA's effort to appropriate the investment in the LLC because Mr. Pfaff
5   allegedly committed unspecified and unrelated "illegal activities").)

6          *1.     The Stein Indictment*

7          Mr. Pfaff is currently a defendant in *United States v. Stein,* a criminal prosecution premised
8   on a forty-six count, seventy-page criminal indictment currently pending in the United States
9   District Court for the Southern District of New York. (Borenstein Decl. Ex. A (hereinafter "Stein
10  Indictment").) The superseding indictment alleges criminal violations of federal law relating to
11  tax strategies for individual clients with the assistance of foreign and domestic banks. (*See*
12  *generally,* Stein Indictment.) In addition, the US Attorney in New York has stated the
13  investigation is on-going. Mr. Pfaff has pleaded not guilty and vigorously disputes the charges.

14         The Stein Indictment alleges, among other things, that Mr. Pfaff entered into a conspiracy,
15  with *inter alia,* John Larson and David Amir Makov, both of whom are defendants in UMDA
16  action, and with KPMG, Mr. Pfaff's former employer. (*See, e.g.,* Stein Indictment at ¶¶ 1, 13, 25-
17  40.) Moreover, Michael Grandinetti, former CEO of UMDA, is on the government's witness list.
18  According to a UMDA director, Grandinetti "entered a guilty plea with regard to Pfaff-related
19  activities and is now a cooperating witness with the government against Pfaff and his associates."
20  (*See* Lifoifoi Decl. Supp. Mot. Temp. Rest. Order dated 5/20/2007 at ¶ 3; *see also* FAC ¶ 57.)

21         Moreover, UMDA received a subpoena from the grand jury in connection with the Stein
22  prosecution, generally seeking information relating to Mr. Pfaff and any "trust in which Mr. Pfaff
23  had/has an interest and/or has any aspect of control." (*See* Borenstein Decl. Ex. B (hereinafter
24  "Subpoena").) In addition to this general request, the Subpoena seeks information relating to any
25  emails between former UMDA CEO Grandinetti and Mr. Pfaff (and the trusts identified above), as
26  well as any "banking or financial records relating to Robert Pfaff." *Id.* In addition to seeking
27  information about Mr. Pfaff, the Subpoena requests documents relating to other entities and
28  persons named in UMDA's complaint, including John Larson and Jaime Romero-Salas. *Id.*

8

1        Mr. Pfaff's alleged activities with Grandinetti and Romero Salas concerning UMDA are

2   the subject of the government's Federal Evidence Rule 404(b) submission to the federal criminal

3   court in New York, claiming that these activities constitute evidence of other crimes and wrongs

4   under that rule. (Borenstein Decl. Ex. C at 2-5.) Indeed, UMDA's complaint notes that it is

5   predicated on the Rule 404(b) briefing. *See* FAC ¶ 52. While the trial court in *Stein* has

6   preliminarily ruled that Mr. Pfaff's alleged activities in Saipan are not admissible under Rule

7   404(b), the ruling is without prejudice to a new request at trial. (*See* Borenstein Decl. Ex. D at 11.)

8              **2.**    ***The Pfaff Indictment***

9        In addition to the Stein Indictment, the grand jury has issued an indictment accusing Mr.

10  Pfaff of alleged inaccuracies in his personal tax returns (*See generally* Borenstein Decl. Ex. E

11  (hereinafter "Pfaff Indictment"). The Pfaff Indictment alleges a conspiracy among, *inter alia*,

12      • "Saipan Company," described as an investor "in various investment activities in Saipan
          and elsewhere in Micronesia, including the purchase and sale of
13        telecommunication, airline, and other assets," which is UMDA (Pfaff Indictment
          ¶ 6)

14      • "Saipan Co-conspirator-1," described as "a resident of Saipan, a certified public
15        accountant, and a senior officer of the [Saipan Company]," who is Michael
          Grandinetti, UMDA's former chief executive officer (*Id.*)
16
        • "Saipan Co-Conspirator-3," described as "a senior officer of" UMDA, who is Peter
17        Sinclair, UMDA's former President (*Id.* ¶ 8)

18      • "Philippines Company," described as "a small construction company located in or
          around Manila, the Philippines," which is obviously Sussex General Contracting
19        ("Sussex") (*Id.* ¶ 9)

20      • "Philippines Co-conspirator," described as a citizen and resident of the Philippines and
          the owner of "Philippines Company," who is Jaime Romero-Salas. (*Id.*)
21
         The Pfaff Indictment generally accuses Mr. Pfaff and several co-conspirators, including
22
    Grandinetti, Sinclair, Salas, Sussex and others of concealing income from the IRS. (*See, e.g.,* Pfaff
23
    Indictment ¶¶ 11-16.) It alleges that Mr. Pfaff obtained fees from transactions with UMDA and
24
    other taxpayers, while concealing these fees from his employer, KPMG. (*Id.* at 18, 19(a).) The
25
    Pfaff Indictment alleges that Mr. Pfaff also cooperated with Grandinetti and others to "defraud"
26
    UMDA, and to cause that fee income "to be sent from bank accounts in the United States and
27
    CNMI to bank accounts in Manila, Philippines" which were controlled by Romero-Salas. (*Id.* ¶
28

1  19-19(e).) Mr. Pfaff is accused of working with Grandinetti and Romero-Salas "to create a series

2  of phony documents [to disguise] fee income [as] a series of loans made to Mr. Pfaff by [Romero-

3  Salas and his company Sussex]." (*Id.* ¶ 21.) The indictment alleges that, as part of Mr. Pfaff's

4  illegal activities, he used an entity known as "W.S. Acquisition Corp." (*Id.*¶¶ 5, 33(jj).)

5          According to the Pfaff Indictment, this scheme culminated in Mr. Pfaff's purchase of

6  35,000 shares of UMDA stock, using Sussex as a nominee purchaser, which shares were allegedly

7  transferred to "a trust [or trusts] Mr. Pfaff had created for his children." (*Id.* ¶ 22-30, *see also* ¶ 17.)

8  The trustee was "Mr. Pfaff's brother-in-law," Thomas Sorenson. (*Id.*¶¶ 19-21.)

9          *3.    The Attorney General's Investigation*

10         On December 13, 2007, the CNMI Attorney General initiated an investigation into "certain

11  transactions" between Mr. Pfaff and UMDA. (*See generally* Borenstein Decl. Ex. G ("Attorney

12  General Letter").) The Attorney General made it clear that its inquiry was to enable it to

13  "investigate and prosecution violations of Commonwealth law." (*Id.* at 1.) Unlike the New York

14  indictments, which relate primarily to alleged violations of United States tax laws, the Attorney

15  General Letter tracks nearly perfectly with UMDA's allegations in this case.

16         The Attorney General alleged that "certain former UMDA directors, officers, agents and

17  consultants may have unlawfully acquired shares in UMDA and unlawfully taken funds and

18  business opportunities belonging to UMDA." (*Id.*.) As a result, the Attorney General requested

19  documents relating a wide area of topics, including (1) UMDA's investment in the LLC and

20  decision to invite others to invest, (2) the formation and structure of the LLC and (3) any of the so-

21  called "Pfaff Parties," a list of entities who are also defendants in UMDA's civil action and about

22  whom Mr. Pfaff was asked questions at his deposition, including: KCT Irrevocable Trust, GET

23  Realty Trust, Paul Dingee, Davina Limited, Monte Perucho Ivestiduras, LLC, Sasquatch II,

24  Rothschild Trust Guernsey Limited, Concorde Trust, Robert Pfaff, John Larson, Amir Makov,

25  Robert Bigelow, Thomas Sorenson, Raymond McCall and Angela Irizarry. (*Id.* at 2.) The criminal

26  inquiry is also focused on communications relating to Grandinetti and Sinclair, the efforts to

27  remove UMDA as manager of the LLC, the purchase or sale of UMDA's shares from 1999 to the

28  present, including to Mr. Pfaff or any "trust...related to, owned by or controlled by" Mr. Pfaff, the

1  issuance of dividends to UMDA shareholders, the disposition of UMDA's cable assets and Sussex

2  and Romero-Salas. (*Id.* at 1-3.) Finally, the Attorney General clarified that its interest in the

3  aforementioned was prompted in part by its role as a shareholder of UMDA. (*Id.* at 1.)

4  **III.    LEGAL ANALYSIS**

5      **A.    Standards Governing Assertion of the Fifth Amendment**

6         In the civil context, the invocation of the privilege is limited to those circumstances in

7  which the person invoking the privilege reasonably believes that his disclosures could be used in a

8  criminal prosecution, or could lead to other evidence that could be used in that manner. *See Ohio*

9  *v. Reiner*, 532 U.S. 17, 20-21 (2001); *see also U.S. v. Bodwell*, 66 F.3d 1000, 1001 (9th Cir. 1995).

10 Accordingly, the privilege protects against disclosures that would not only be directly potentially

11 incriminating, but also against those that could provide an indirect link to incriminating evidence.

12 *Id.*; *U.S. v. Hubbell*, 530 U.S. 27, 38 (2000)("Compelled testimony that communicates information

13 that may 'lead to incriminating evidence' is privileged even if the information itself is not

14 inculpatory.")(*citing Doe v. U.S.*, 487 U.S. 210, 208, n. 6 (1998)).

15        The Fifth Amendment privilege against self-incrimination extends not only to answers that

16 would in themselves support conviction, but also to those which would furnish a link in chain of

17 evidence needed to prosecute claimant. *Reiner*, 532 U.S. at 20-21. Thus, it is not merely an

18 admission of guilt of a crime, or of a probative fact which, with others, may aid in establishing

19 guilt, that may be withheld; the privilege to remain silent may also be validly asserted where the

20 answer to a question would be likely to provide a lead or clue to a source of evidence of such

21 crime, and thus furnish a means of securing one or some of the "links in the chain of evidence"

22 required for federal prosecution of the witness. *Counselman v. Hitchcock*, 142 U.S. 547 (1982);

23 *U.S. v. Sharp*, 920 F.2d 1167 (4th Cir. 1990); *U.S. v. Rendahl*, 746 F.2d 553 (9th Cir. 1984); *U.S.*

24 *v. Powe*, 591 F.2d 833 (D.C. Cir. 1978).

25        The burden on a witness to establish his or her right to refuse to answer does not depend

26 upon "likelihood," but rather only upon the "possibility[,] of prosecution." *Doe by & Through*

27

28

11

1  *Rudy-Glanzer v. Glanzer*, 232 F. 3d 1258, 1263 (9th Cir. 2000).[8] The witness has considerable

2  latitude in deciding when to stop responding to questions, in order to avoid placing him in the

3  dilemma where invoking the privilege too soon could be contempt of court while invoking it too

4  late could constitute waiver. Thus, "granted that the area of the question is within the Fifth

5  Amendment, short of being ridiculous, it would appear wiser to let the witness pick the point

6  beyond which he will not go." *Shendal v. U.S.*, 312 F.2d 564, 566 (9th Cir. 1963). In deference to

7  this standard, "an assertion of privilege should not be overridden unless it is "perfectly clear ... that

8  the witness is mistaken, and that the answer(s) cannot possibly tend to incriminate." *Hoffman v.*

9  *U.S.*, 341 U.S. 479 (1951). Where, as here, an investigation continues and its precise contours are

10  unknown, the scope of the privilege is especially wide.

11  **B.    UMDA's Questions Unequivocally Raise Subjects Protected by the Privilege**

12  UMDA's motion identifies only 18 questions posed to Mr. Pfaff in deposition, and claims

13  without argument that they seek nothing more than clearly "innocuous and basic" information, to

14  which the Fifth Amendment does not apply.[9]  (*See* UMDA Mot. at 11-12.) In contrast, UMDA's

15  "Appendix" lists a total of *331* individual questions, and UMDA appears to request an order

16  overruling Mr. Pfaff's privilege for each of them. (*Compare* UMDA's Appendix *with* UMDA

17  Mot. at 9-10.)

18  The only way the privilege can be asserted is on a question-by-question basis. *See Bodwell,*

19  66 F.3d at 1001. UMDA's slipshod approach is apparently designed to require the Court and Mr.

20  Pfaff to individually address *331* questions individually, without a clue as to why UMDA believes

21

22  [8] *See also* ; see, also, *U.S. v. Castro*, 129 F.3d 226 (1st Cir. 1997), *In re Flat Glass Antitrust*
   *Litigation*, 385 F.3d 350 (3d Cir. 2004; *U.S. v. Sharp*, 920 F.2d 1167 (4th Cir. 1990), *U.S. v.*

23  *Whittington*, 786 F.2d 644 (5th Cir. 1986); *U.S. v. Mack*, 159 F.3d 208 (6th Cir. 1998); *In re*
   *Corrugated Container Antitrust Litigation*, 661 F.2d 1145 (7th Cir. 1981); *U.S. v. Bowling*, 239

24  F.3d 973, 977 (8th Cir. 2001); *U.S. v. Nunez*, 668 F.2d 1116 (10th Cir. 1981); *U.S. v. Caldwell*,
   543 F.2d 1333 (D.C. Cir. 1974).

25

26  [9] UMDA failed even to mention the other objections asserted by counsel to many of the questions.
   The failure to challenge the specific objections to the questions should result in sustaining the

27  objections. Hence, even if the Fifth Amendment privilege is overruled, Mr. Pfaff would still not be
   required to respond to the many objectionable questions.

28

1    the privilege assertion is objectionable. Although Mr. Pfaff embraces his burden of establishing

2    the propriety of any privilege he asserts, counsel submits that this approach is not an appropriate

3    use of resources where UMDA has failed to offer anything beyond its own self serving claims to

4    support its challenge to Mr. Pfaff's assertion of the privilege. UMDA must do more than highlight

5    18 questions, out of 331, and expect the Court and Mr. Pfaff to search for the basis for UMDA's

6    objection concerning the other 313 questions.

7        Mr. Pfaff has collected all 331 questions identified by UMDA, and organized them

8    topically in Table 1.[10] (*See* Borenstein Decl. Ex. H. (hereinafter ("Table 1").) Once organized

9    topically, the potentially incriminating nature of the questions posed is clear. UMDA might claim

10   that even these 18 questions are "basic and innocuous." However, there is no exception to the Fifth

11   Amendment for "basic" information —such information remains privileged if it is potentially

12   incriminating – and a review of the questions listed in the motion, organized topically with the

13   remaining questions listed in UMDA's Appendix, make it clear that answering even these

14   preliminary questions raise the possibility of providing a link in the chain of evidence supporting a

15   prosecution.

16                *1.    Purported Misappropriation of UMDA Shares*

17       For example, UMDA posed 148 questions concerning its allegation that Mr. Pfaff

18   somehow misappropriated UMDA shares. (*See* Table 1 at § I.A.) These questions – along with all

19   the foundational questions leading up to these ultimate questions – go to the heart of the criminal

20   charges faced by Mr. Pfaff.

21       First, the Stein Indictment alleges a conspiracy involving, among others, Mr. Pfaff, Makov

22   and Larson, three of the same alleged co-conspirators UMDA asked about. Any question

23   concerning the relationship between Mr. Pfaff and Makov or Larson relates to the heart of the

24   criminal case and concerns the first element in a conspiracy charge-- concerted action among the

---

25

26   [10] UMDA's Appendix excludes 134 additional questions to which Mr. Pfaff interposed the Fifth
     Amendment privilege. UMDA apparently concedes that privilege was properly invoked in
27   response to these questions. Also, UMDA lists questions in its Motion that are not included in the
     Appendix. (*See* Mot. at 9-10, questions 10-15.)

28

1   conspirators. *U.S. v. Jimenez Recio*, 537 U.S. 270, 274 (2003)(the essence of a conspiracy is "an

2   agreement to commit an unlawful act"). Moreover, the Government's Rule 404(b) motion seeks to

3   introduce evidence of Grandinetti and Romero-Salas working in concert with Mr. Pfaff, and for

4   the same reason, even "basic" information about their relationship with Mr. Pfaff is potentially

5   incriminating, or could lead to incriminating evidence. Second, the Pfaff Indictment alleges that

6   Mr. Pfaff's acquisition of UMDA shares was part of a criminal enterprise with Grandinetti and

7   Sinclair to "defraud" UMDA by obtaining its shares. (Pfaff Indictment ¶ 21-30.) Third, the

8   Attorney General Letter alleges that Mr. Pfaff may have obtained shares of UMDA illegally, both

9   explicitly and by seeking documents relating to all purchases and sale of shares since 1999,

10  including specifically to Mr. Pfaff. (Attorney General Letter at 1-2.) As if more were needed, the

11  Attorney General Letter expressly seeks communications relating to all four of these individuals:

12  Grandinetti, Sinclair, Larson and Makov. (*Id.*)

13          A related line of questions seeks information about a variety of entities that UMDA

14  appears to believe were the unlawful recipients of the UMDA shares Mr. Pfaff allegedly "stole."

15  (Table 1 at § I.B.) Chief among these are KCT and GET, along with their trustee at the time,

16  Thomas Sorenson. (Table 1 at § I.B.1.) The potentially incriminating nature of these questions is

17  obvious, as these trusts are expressly mentioned as targets of investigation in both criminal

18  proceedings in New York. (*See* Subpoena and Pfaff Indictment at ¶¶ *17*, 22-30.) The Attorney

19  General Letter also seeks information relating to these trusts, and their relationship with Mr. Pfaff,

20  in connection with a criminal prosecution. (Attorney General Letter at 1-2.)

21          UMDA's additional questions asked Mr. Pfaff to admit to providing UMDA shares to

22  other entities, including: (1) First Court Ltd, (2) Global Leadership Consulting, Inc., (3) Keysdale

23  Ventures, LLP and its manager, Tapia America, Ltd., (4) Raymond McCall and his law firm and

24  his wife Angela Irizzary, (5) Morley, Inc., (6) Norskanvest, LLC and (7) Bonnie Sorenson, (8)

25  Concorde Trust and (9) Paul Dingee. (Table 1 § I.B.2-10.)[11] According to UMDA's questioning,

26  _____

27  [11] UMDA also asked whether Mr. Pfaff has any documents relating to these entities, as well as
    several other entities. (*See, e.g.*, Appendix at Nos. 69-84.) Such queries are clearly subject to the
28  (footnote continued)

14

1     when read in light of the Pfaff Indictment and the Attorney General Letter, these entities are the

2     alleged recipients of "stolen goods," and Mr. Pfaff's testimony concerning these entities could

3     result in further evidence that Mr. Pfaff himself was involved in the "theft."

4               **2.**     *Purported Misappropriated Corporate Opportunities*

5         In addition to alleging that Mr. Pfaff misappropriated its shares, UMDA also alleges that

6     Mr. Pfaff misappropriated UMDA's corporate opportunities. Two such opportunities were

7     identified in at the preliminary injunction hearing and were also raised at the deposition: (1) an

8     alleged opportunity to renegotiate a note held by City National Bank, and (2) the opportunity to

9     invest in the LLC. (*See* Table 1 §§ II-III.) Without any further inquiry, it is apparent that any

10    questions on these topics could reveal potentially incriminating information, as the Attorney

11    General Letter makes it clear that it is investigating criminal misappropriation of UMDA's

12    corporate opportunities. (Attorney General Letter at 1.)

13        In addition, the CNB note contentions involve Mr. Pfaff, Grandinetti, Sinclair and

14    Romero-Salas, all subjects of the Rule 404(b) evidence and the Subpoena, as well as the subject of

15    the Pfaff Indictment. (*Id.*, Subpoena and Pfaff Indictment ¶ 21.) Similarly, the formation and

16    operation of the LLC, including any efforts to remove UMDA as manager of the LLC, (Table 1 §

17    II.A-C) are expressly referenced in the Attorney General Letter.[12]

18             **3.**     *Transactions Specifically Mentioned by Prosecuting Authorities*

19        UMDA also posed questions concerning Mr. Pfaff's purported illegal receipt of "side fees"

20    for offering tax advice – a subject which is cornerstone of the allegations contained in the Pfaff

21    Indictment. (*Compare* Table 1 at § IV.A.2 *with* Pfaff Indictment 11-19(a).) The side fees are also

22

23    Fifth Amendment privilege. *See, e.g., Curcio v. United States,* 354 US 118, 128 (1957). *Armstrong*

24    *v. Guccione,* 470 F.3d 89, 100 (2d Cir. 2006).

     [12] UMDA also posed a series of questions concerning investments in the LLC made by GET

25    Realty Trust, KCT Irrevocable Trust, Robert Bigelow, Sasquatch II and Rothschild Trust

26    Guernsey Limited. (Table 1 § II.C.) These queries seek potentially incriminating information not
     only because they relate to transactions which the Attorney General Letter posits are criminal, but

27    also because these entities are specifically mentioned in the Attorney General Letter as possible
     criminal co-conspirators of Mr. Pfaff. (*See* Attorney General Letter at 2.)

28

1   an element of the government's Rule 404(b) submission. (Borenstein Decl. Ex. C at 2-5.)

2   Similarly, UMDA's questions concerning the disposition of its cable assets are evocative of the

3   Attorney General's inquiry into that same topic. (*Compare* Table 1 at § IV.A.1 *with* Attorney

4   General Letter at 3.) UMDA's questions obviously seek potentially incriminating information.

5               **4.      Entities Specifically Mentioned By Prosecuting Authorities**

6           While the foregoing queries seek information relating to purportedly criminal transactions,

7   the UMDA's remaining questions seek information about entities that are alleged co-conspirators

8   or participants in those transactions. For example, UMDA poses questions about Avenida LLC

9   and Chestnut LLC, entities that UMDA alleges participated with WS Investment Trust, the former

10  name of GET. (Table 1 § IV.B.2-3.) Similar queries are posed regarding Morley, Inc. and Point du

11  Hoc Irrevocable Trust. (Table 1 § IV.B.4-5.) As the Pfaff Indictment and the Attorney General

12  Letter both allege that GET was used by Mr. Pfaff for criminal transactions, Mr. Pfaff's invocation

13  of the privilege was appropriate.[13]

14          Similarly, UMDA seeks information regarding Davina Limited, KPMG and WS

15  Acquisition Corp. (Table 1 § IV.B.6-8.) All of these entities are related to either the Attorney

16  General Letter and included as a so-called "Pfaff Party" therein (Attorney General Letter at 2), or

17  are specific co-defendants or co-conspirators in *Stein,* (Stein Indictment ¶¶ 1-2 (discussing

18  KPMG)).[14]

19

20  [13] UMDA also posed a series of questions involving Pfaff's service on the UMDA Board of
21  Directors' Audit Committee. (Table 1 § V.A.) UMDA's questions here are designed to show that
    Pfaff deliberately obstructed the Audit Committee's investigatory function so that he could
22  continue with his purportedly illegal schemes. As the entire line of questions is premised on the
23  theory that Mr. Pfaff used the audit committee to hide his alleged criminal acts, these questions
    clearly seek information that is privileged by the Fifth Amendment.

24  [14] The final series of questions ask about Mr. Pfaff's state of mind regarding the indictments and
25  investigations made against him and seek core Fifth Amendment testimony. (Table 1 § V.B.) At a
    minimum, such queries also seek information protected by the attorney-client privilege and/or
26  work product doctrine. UMDA also complains that Mr. Pfaff refused to answer a single question
    on the advice of counsel. The question asked: "This was part of your effort to launder tax shelter
27  fees that you had accumulated, correct?" This question, which is merely a bald face assertion that
    Mr. Pfaff has committed a crime, is nothing more than harassment, and counsel was well within
28  (footnote continued)

1        <u>C.</u>    <u>UMDA's Attempt to Misuse The Collective Entity Doctrine Is Unavailing</u>

2        UMDA also moves for an order compelling Mr. Pfaff to produce documents relating to a

3    variety of entities, including several defendants in this civil case. (*See, e.g.*, UMDA Mot. at 3-4.)

4    Mr. Pfaff asserted his Fifth Amendment privilege in response to these requests, as the production

5    of documents relating to these entities would require Mr. Pfaff to admit that such documents exist,

6    are in Mr. Pfaff's possession and control, and are authentic. *See, e.g., Hubbell*, 530 U.S. at 36.

7    These types of admissions implicitly communicate statements of fact that may lead to potentially

8    incriminating evidence. *See id.* at 36-38.

9        UMDA does not dispute that production of the documents sought in its requests are

10   potentially incriminating. Rather, UMDA's sole objection is that the documents are exempt from

11   Fifth Amendment protection under the "collective entity doctrine," which bars an entity or its

12   custodian of records from asserting the Fifth Amendment. Here, however, UMDA does not seek to

13   compel the production of documents from any entity, and does not seek documents held by Mr.

14   Pfaff in any capacity as custodian of records. To the contrary, UMDA served a request on Mr.

15   Pfaff as an individual, and individuals *may* assert the Fifth Amendment and refuse to produce

16   documents when that production would be potentially incriminating.

17       *1.    The Collective Entity Rule Does Not Apply to Individuals*

18       As the United States Supreme Court held in *Braswell v. U.S.*, 487 U.S. 99 (1988), a

19   "custodian of corporate records may [not] resist a subpoena for such records on the ground that the

20   act of production would incriminate him." The rule, as originally articulated in *Hale v. Henkel*,

21   201 U.S. 43 (1906) depended on the "visitorial powers" of the state to investigate corporations,

22   and finding that in light of such powers, the production of corporate records cannot be privileged.

23

24   his rights to instruct the witness not to answer. *See* Com. R. Civ. P. 30(d)(3) (instruction not to

25   answer proper when the deposition "is being conducted in bad faith or in such manner as

    unreasonably to annoy, embarrass, or oppress the deponent or party.") To the extent Rule 30

26   requires an immediate suspension of the deposition, and request for a protective order, a failure to

27   do so is, at best, a harmless error, where the question is so obviously improper. *See, e.g., U.S. ex rel. Tiesinga v. Dianon Systems, Inc.*, 240 F.R.D. 40 (D. Conn. 2006).

28

    17

1 | *Braswell*, 487 U.S. at 107-108. However, later cases "jettisoned" this argument and instead found
2 | that a custodian of records holds those records in a "representative capacity." *Id.* Therefore, if the
3 | agent were permitted to assert the privilege, he would be doing so on behalf of the entity he
4 | represented, not himself. *Id.* Since only individuals have a Fifth Amendment right, the Court held,
5 | such an assertion would be improper. *Id.*

6 |      But *Braswell* is clear to note that the foregoing applies only when the "subpoena is
7 | addressed to the corporation [or] to the individual *in his capacity* as custodian." *Id.* at 108-109.
8 | "[A]rtificial entities such as corporations may act only through their agents, and a custodian's
9 | assumption of his representative capacity leads to certain obligations, including the duty to
10 | produce corporate records." *Id.* at 110. Because the custodian "does not hold them in his private
11 | capacity [he] is not therefore protected against their production." *Id.* at 111 n.4. The Court is
12 | careful to point out that the status of the holder of the records is the essential element to the rule.
13 | *Id.* at 112 n. 5. The custodian's status as an agent for the corporation is so crucial to the analysis
14 | that the Court in *Braswell* holds that the Government can "make no evidentiary use of the
15 | 'individual act' against the individual." *Id.* at 118.

16 |      The obvious thrust of *Braswell* is that the production of documents by an entity is not
17 | privileged, even if the production might incriminate the custodian of records for the corporation.
18 | However, *Braswell* is equally clear that documents held by an individual *in his personal capacity*
19 | remain subject to a privilege objection. *See, e.g., Bellis v. U.S.*, 417 U.S. 85, 93 (1974)(for the rule
20 | to apply, "it must be fair to say that the records demanded are the records of the organization
21 | rather than those of the individual").

22 |      This was made clear in a number of cases addressing subpoenas and document requests
23 | sent to a former agent of an entity. The leading case is *In re Three Grand Jury Subpoenas Duces*
24 | *Tecum Dated January 29, 1999*, 191 F.3d 173 (2d Cir. 1999). There, three former officers of a
25 | corporation received a subpoena seeking documents in the officers' care "that were created during
26 | the course of, or in connection with [their] employment at [the corporation]." *Id.* at 175. The
27 | officers asserted their Fifth Amendment privilege, and the government moved to compel. *Id.* On
28 | appeal, the Second Circuit began its analysis along the same lines as *Braswell*, and noted that

18

1   *Braswell*'s holding "relied on the fact that the individual subpoenaed held the collective entity's

2   records in a 'representative capacity,' rendering 'his personal privilege against compulsory self-

3   incrimination ... inapplicable.'" *Id.* at 178 (*citing Braswell,* 487 U.S. at 108, alterations in

4   original)

5         However, a former employee is no longer a representative of the corporation, and therefore

6   the rule does not apply. "Once the officer leaves the company's employ, ... he no longer acts as a

7   corporate representative but functions in an individual capacity in his possession of corporate

8   records." *Id.* (*citing In re Grand Jury Subpoena Duces Tecum Dated June 13 1983 and June 22,*

9   *1983,* 722 F.2d 981 (2d Cir. 1983)). This holding is compelled by *Braswell,* which "was

10  predicated on the rationale that corporate custodians hold and produce documents *in a*

11  *representational capacity* and that when a corporate custodian produces subpoenaed corporate

12  records, at bottom, the corporation produces the documents subpoenaed." *Id.* In stark contrast,

13  "once the agency relationship terminates, the former employee is no longer an agent of the

14  corporation and is not a custodian of the corporate records." *Id.* As a result, when "such an

15  individual produces records in his possession he cannot be acting in anything other than his

16  personal capacity. In no sense can it be said, as Braswell requires, that 'the corporation produced

17  the records subpoenaed.'" *Id.*

18         Nor is the Second Circuit alone in this holding.[15] In *U.S. v. McLaughlin,* 126 F.3d 130, 133

19

---

20  [15] The Second Circuit recognized in *In re Three Grand Jury Subpoenas* that the Eleventh Circuit

21  and D.C Circuit have "split" on the applicability of *Braswell* to former employees. The Second
Circuit finds these cases unpersuasive, and for good reason. The Eleventh Circuit premised its

22  holding that *Braswell* would apply to former employees on a footnote from a prior Supreme Court
case, but the cited footnote provides no support for the Eleventh Circuit's conclusion. *In re Grand*

23  *Jury Subpoena (Paul),* 957 F.2d 807, 811 (11th Cir. 1992). Rather, the footnote discusses the
dissolution of a partnership, and notes that, even after dissolution, the partnership has ongoing

24  responsibilities under state law, and therefore, the custodian of a dissolved entity must still
respond to document subpoenas. *See Bellis v. U.S.,* 417 U.S. 85, 96 n. 3 (1974). The situation

25  described in *Bellis,* i.e., the duties of a present custodian of an inactive entity, is obviously
different than the situation in Paul, i.e., the duties of a former custodian for an active entity. See

26  also *In re Grand Jury Subpoena,* 784 F.2d 857 (6th Cir. 1986)(cited with approval by *Paul,* but

27  noting that the putative custodian had a present relationship with the entity). Moreover, *Paul*
seems premised on the belief that the "corporate nature" of the documents compels their

28  (footnote continued)

1   n. 2 (3d Cir. 1997), the Third Circuit noted that "a former employee, for example, who produces

2   purloined corporate documents is obviously not within the scope of the *Braswell* rule." The Ninth

3   Circuit is in accord, holding that "the collective entity rule...does not apply to a former employee

4   of a collective entity who is no longer acting on behalf of [the] collective entity." *In re Grand Jury*

5   *Proceedings, 71 F.3d 723, 724 (9th Cir. 1995).*

6                  2.      *UMDA Has Not Requested Documents From Mr. Pfaff as a Custodian*

7          Having conceded that the production of the documents requested by Mr. Pfaff could be

8   incriminating under *Hubbell,* UMDA argues instead that its requests fall under the collective

9   entity rule. They do not. Rather, it is clear that the document request was directed to Mr. Pfaff as

10  an individual. (O'Connor Decl. Ex. 5 at 1.) The request instructs Mr. Pfaff, not any entity, to

11  produce documents. Moreover, it is clear that the documents requested pertain to Mr. Pfaff

12  personally, not as a custodian of records. For example, the request seeks (1) Mr. Pfaff's personal

13  bank records (Reqs. 4-7), (2) documents and communications between Mr. Pfaff individually and

14  a variety of persons and entities (Reqs. 8-19), and (3) documents relating to Mr. Pfaff's retention

15  of counsel as an individual (Reqs. 22-24.) The hallmark of a document request falling under the

16  "collective entity rule" is that the request is directed to the corporation or entity, and that the

17  documents sought are the entity's documents, yet UMDA's request here is nothing less than a

18  personal request to Mr. Pfaff.

19         As many of the entities UMDA seeks information about are parties to the litigation, the

20  proper procedure is for UMDA to serve those parties with document requests under Rule 34, and

21  if necessary, take the 30(b)(6) deposition of those entities if it has questions about those

22  documents to ask of the entity. To the extent an entity is not a party, UMDA must serve that entity

23

24  _____

    production, whereas *Braswell* held that the "representative capacity" of the agent is the deciding
25  factor. The case arising out of the D.C. Circuit is equally distinguishable, as the documents sought
    there were possessed by the government. See *In re Sealed Case,* 950 F.2d 736, 740 (D.C. Cir.
26  1991). Obviously, government documents, unlike entity documents, cannot be confused for
    personal documents which are immune from production.
27

28

                                          20

1   with a document and/or deposition subpoena under Rule 45. However, UMDA cannot use the

2   "collective entity doctrine" to obtain such documents or testimony – which UMDA admits would

3   be potentially incriminating – from Mr. Pfaff directly, especially where, as here, to do so would

4   implicate significant jurisdictional issues since it is likely none of the custodians are in Saipan.

5       **D.    UMDA Effort to Thwart Obviously Relevant Document Production Is**

6            **Completely Unfounded and Unsupported by Any Authority**

7       UMDA claims that Mr. Pfaff has forfeited his right to conduct discovery of UMDA,

8   because he has, according to UMDA, improperly asserted his Fifth Amendment right to be free

9   from self-incrimination. Tellingly, although UMDA cites ten cases that allegedly support this

10  theory, *not a single one* has ever excused a plaintiff from responding to properly propounded

11  discovery requests by a defendant asserting the Fifth Amendment.

12      The analysis must begin with the CNMI civil procedure rules, which are patterned after the

13  Federal Rules of Civil Procedure. Thereunder, "litigants do not have a right to discovery of

14  privileged matters," as Rule 26 specifically excludes privileged information from discovery. *See*

15  *U.S. v. Certain Real Property and Premises Known As: 4003-4005 5th Ave., Brooklyn, NY*, 55

16  F.3d 78, 82-83 (2d Cir. 1995)("*Certain Real Property*"); *SEC v. Graystone Nash, Inc.*, 25 F.3d

17  187, 190-191 (3d Cir. 1994); *see also* Com. R. Civ. P. 26(b)(1) ("Parties may obtain discovery

18  regarding any matter, *not privileged*"). As the Ninth Circuit noted, "the Rules of *Civil* Procedure

19  recognize an appropriate role for the exercise of this privilege, and a refusal to respond to

20  discovery under such invocation cannot justify the imposition of penalties." *Glanzer*, 232 F.3d at

21  1265 (emphasis in original); *see also Wehling v. Columbia Broadcast System*, 608 F.2d 1084,

22  1086-1087 (5th Cir. 1980) (noting that the Rules "contain specific language exempting privileged

23  information" and that "no provision in the federal discovery rules … authorizes a court to impose

24  sanctions on a party who resists discovery by asserting a valid claim of privilege").

25      Thus, UMDA has no right to any *sanction* for Mr. Pfaff's proper assertion of the Fifth

26  Amendment. Rather, judges in some jurisdictions are permitted to take certain limited steps to

27  "balance the interests of the party claiming protection against self-incrimination and the

28  adversary's entitlement to equitable treatment." *See, e.g., Graystone Nash*, 25 F.3d at 192.

1  Typically, this balancing takes the form of a limitation on the evidence the privilege-asserting

2  party may present at trial or take the form of an adverse inference at trial. *Id.*; *but see* Cal. Evid.

3  Code § 913(a)(neither the court nor counsel may comment upon the fact a witness has claimed a

4  privilege).

5         No case cited by UMDA holds that a defendant asserting a privilege is barred from

6  conducting discovery of the plaintiff. Instead, UMDA cites district court authorities from the

7  1980's, such as *SEC v. Cymaticolor Corp.*, 106 F.R.D. 545, 549 (S.D.N.Y. 1985), and *SEC v.*

8  *Benson*, 657 F. Supp. 1122, 1129 (1987), which appear to bar an asserting party's presentation of

9  evidence, *after discovery ended*, to the fact finder. However, UMDA deceives the Court by

10  conveniently neglecting to reveal that both cases have been expressly repudiated. In *SEC v.*

11  *Graystone Nash*, 25 F.3d at 191, the Third Circuit held that "a complete bar to presenting any

12  evidence, from any source, that would in all practical effect amount to the entry of an adverse

13  judgment, *would be an inappropriate sanction*." (emphasis added). The Third Circuit specifically

14  lists both *Cymaticolor* and *Benson* as poorly reasoned and not "satisfactory" because they run

15  afoul of this rule.[16] *Id.* at 193. Similarly, the Second Circuit's opinion in *Certain Real Property*

16  further rejects decisions that "automatically enter[] judgment against the party that invoked the

17  Fifth Amendment or has precluded that party from presenting any evidence whatsoever." 55 F.3d

18  at 85 n. 8. As a consequence, UMDA's reliance on 20 year old, selectively cited cases, including

19  *Cymaticolor* and *Benson*, is misplaced; the result in those two cases could not be reached today by

20  that same court under binding Second Circuit precedent, or by the other circuits.[17] *See also* Wright

21

22  _____

23  [16] As *Graystone Nash* noted, the holding in *Benson* appears motivated by defendant's unrelated
    discovery abuses, not a proper invocation of the Fifth Amendment. *Graystone Nash*, 25 F.3d at
24  192.

25  [17] For example, the Ninth Circuit cites with approval the holding in *SEC v. Graystone Nash*. *See,*
    *e.g.*, *Glanzer*, 232 F.3d at 1265 ("Because the privilege is constitutionally based, the detriment to
26  the party asserting it should be no more than is necessary to prevent unfair and unnecessary
    prejudice to the other side"). UMDA ignores this authority and instead cites *SEC v. Colello*, 139
27  F.3d 674, 677 (9th Cir. 1998), which held only that an adverse inference was permissible, and
    offers no support for UMDA's contention that Mr. Pfaff has forfeited his right to discovery.

28

22

1   and Miller, 8 *Federal Practice & Procedure* § 2018 n. 46 (2008)(citing cases) (precluding party

2   invoking privilege from defending is improper sanction).

3          Here, UMDA's motion seeking immunity from discovery requests the same impermissible

4   sanction that is expressly rejected by *Graystone Nash* and *Certain Real Property*. By barring Mr.

5   Pfaff from conducting any discovery of UMDA at all, UMDA effectively prevents Mr. Pfaff from

6   putting on *any* defense, and imposes what is essentially a default judgment. Thus, UMDA does not

7   seek to "level the playing field" but instead to "tilt it strongly in favor of" UMDA. *Graystone*

8   *Nash*, 25 F.3d at 193.

9          Nor do UMDA's remaining authorities offer any support for so sweeping a remedy. For

10  example, the court in *Centennial Life Insurance Co. v. Nappi*, 956 F. Supp. 222 (1997), refused to

11  allow a defendant—who had asserted the privilege and also failed to conduct *any* discovery before

12  plaintiff moved for summary judgment – to *re-open* discovery to respond to the motion.

13  *Centennial* thus concerns the timing of discovery, not with the litigant's fundamental right to

14  obtain the evidence in the first place. Moreover, like *Centennial*, UMDA's other authorities,

15  including *SEC v. Grossman*, 887 F. Supp. 649, 660 (S.D.N.Y. 1995) and *Kroger Co. v. Am-Hi,*

16  *Inc.*, 2006 WL 2572124 (2006), limit the preclusion of evidence and testimony to those topics

17  expressly encompassed by the asserted privilege. In other words, these cases hold that a defendant

18  may not simultaneously contend that certain information in defendant's possession is privileged,

19  yet at the same time use that same information in its own case. Obviously, that is not the case here,

20  where Mr. Pfaff seeks information *in Plaintiff's possession. See, e.g., S.E.C. v. Merrill Scott &*

21  *Associates, Ltd.*, 505 F.Supp.2d 1193, 1211 (D. Utah 2007)("defendant is not precluded from

22  remaining silent and, at the same time, testing the government's proof and offering evidence (other

23  than his last-minute testimony) to rebut such proof"); *S.E.C. v. Rehtorik*, 135 F.R.D. 204, 206

24  (M.D. Fla. 1991)("The defendant has a legitimate right, free of court imposed restrictions, to

25  attack plaintiff's case by means of evidence other than his own privileged testimony."); *SEC v.*

26  *Thomas*, 116 F.R.D. 230, 234 n. 16 (D. Utah 1987)(same). *See also Certain Real Property*, 55

27  F.3d at 85 n. 8 (noting with approval circuit decisions overturning district court orders precluding

28  parties from presenting any evidence whatsoever); *Traficant v. Commissioner*, 884 F.2d 258, 265

1   (6th Cir. 1989) (reversing trial court's order preventing defendant from exploring the contents and

2   significance of plaintiff's evidence).

3          UMDA also cites authorities concerning the assertion of the privilege followed by a self-

4   interested waiver – *see SEC v. Softpoint, Inc.*, 958 F. Supp. 846 (S.D.N.Y. 1997) – or the assertion

5   of the privilege over matters on which the defendant bears the burden of proof – *see In re Moses*,

6   792 F. Supp. 529 (E.D. Mich. 1992). Neither situation is present here. Mr. Pfaff has consistently

7   asserted his Fifth Amendment right and has not attempted to waive it at an opportune time to gain

8   an unfair advantage over UMDA. Nor has Mr. Pfaff asserted the privilege over any matters on

9   which he bears the burden of proof. UMDA, not Mr. Pfaff, is the plaintiff in this case. Mr. Pfaff

10  needs to prove nothing at trial; rather, UMDA carries the burden of proof. Thus, Mr. Pfaff is not

11  "using the privilege as a sword" as claimed by plaintiff. To the contrary, it is UMDA that seeks to

12  use Mr. Pfaff's assertion of the privilege as an excuse to evade discovery. In any event, in neither

13  case did the Court deny the party asserting the privilege to conduct discovery or present evidence.

14  *In re Moses* did not involve discovery at all and *Softpoint* expressly permitted the presentation of

15  other evidence by the party invoking the privilege. *See SEC v. Softpoint, Inc.*, 958 F. Supp. at 859.

16  Even if Mr. Pfaff had invoked the Fifth Amendment improperly, the CNMI rules provide certain

17  remedies to UMDA – none of which contemplate a complete exemption from discovery. Rather

18  than attempting to vindicate the clear policy of Rule 26 that all *non-privileged* materials be

19  disclosed, UMDA turns this notion on its head by seeking actively to conceal documents which

20  are not subject to any privilege and are admittedly relevant – indeed, they likely foreclose any

21  relief to UMDA. Although UMDA attempts to disguise its motion as one designed to "level the

22  playing field" and "ensure fairness to all parties," UMDA's motion is in reality a vehicle for

23  avoiding production of documents that surely must undercut its unsupportable claims.

24  Accordingly, UMDA's objection to Mr. Pfaff's document requests should be overruled.

25  IV.    **CONCLUSION**

26         For all of the forgoing reasons, UMDA's motion to compel and for a protective order

27  should be rejected. Under Rule 37(a)(4), UMDA and its counsel should be ordered to pay Mr.

28  Pfaff fees and costs in responding to the motion.

                                        24

1    DATED: June 15, 2008              Respectfully submitted,

2                                      OVERLAND BORENSTEIN SCHEPER & KIM LLP

3
                                          /s/ Mark A. Borenstein
4                                         MARK A. BORENSTEIN, ESQ.
                                          Attorney for Defendant Robert Pfaff
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

25