# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                          :

                          -v-                              :

ROBERT PFAFF,                                      :

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**INDICTMENT**

08 Cr.

**08 CRIM 239**

### COUNT ONE
(Conspiracy)

The Grand Jury charges:

### The Defendant And His Entities

1.     At all times relevant to this Indictment, ROBERT PFAFF, the defendant, was a certified public accountant, non-practicing attorney, and a resident of Colorado. From at least 1993 until on or about August 31, 1997, PFAFF was a partner or "member" of the accounting firm KPMG, LLP ("KPMG"), where he specialized in international tax law and also designed, marketed, and implemented tax shelter transactions.

2.     At all times relevant to this Indictment, KPMG was a limited liability partnership. From at least 1993 until the departure of ROBERT PFAFF, the defendant, from KPMG on or about August 31, 1997, the by-laws and/or other rules and procedures of KPMG required that all compensation and fees earned by partners be remitted to the

partnership, unless an exception to this rule was made by the KPMG Chairman or the board of directors.

3.    From in or about 1993 until in or about 2003, ROBERT PFAFF, the defendant, owned, controlled, and was affiliated with a number of corporate or other entities including, among others: Veskan, LLC; Norvest, LLC; Skandia; Skandia Capital Group; JW Acquisition Corp. LLC; Western Systems Acquisition Corp., also known as "W.S. Acquisitions;" Petavest, Inc.; Orinda Investments Ltd.; and Somer Leasing LLC.

### Other Relevant Individuals And Entities

4.    At all times relevant to this Indictment, Chandler S. ("Stuart") Moisen, a co-conspirator not named as a defendant herein, was a resident of Colorado and California. Prior to residing in Colorado and California, Moisen was a resident of Saipan, which is part of the Commonwealth of the Northern Mariana Islands ("CNMI"), a commonwealth of the United States and one of the Western Pacific nation-states or territories that comprise Micronesia. Although generally governed by United States law, the CNMI has its own tax authority and code, the provisions of which generally mirror those contained in the Internal Revenue Code.

5.    Between in or about 1993 and 2003, Moisen owned, controlled, and was affiliated with a number of corporate or other entities including, among others: Redres Capital Group, Inc.; Skandia; Skandia Capital Group; Western Systems

Acquisition Corp., also known as "W.S. Acquisitions;" Petavest, Inc.; Orinda Investments, Ltd.; and Somer Leasing LLC.

6.    Between in or about 1993 and 2003, Saipan Co-conspirator-1, a co-conspirator not named as a defendant herein, was a United States citizen, a resident of Saipan, a certified public accountant, and a senior officer of a company located in Saipan (hereinafter "the Saipan Company"). At all times relevant to this Indictment, the Saipan Company was involved in various investment activities in Saipan and elsewhere in Micronesia, including the purchase and sale of telecommunication, airline, and other assets.

7.    Between in or about 1993 and 2003, Domenick DeGiorgio, a co-conspirator not named as a defendant herein, was a resident of New York, a certified public accountant, and an employee of the New York branch of a German bank. From in or about 1993 through in or about 1998, that bank was known as Bayerische Vereinsbank AG (hereinafter "BV"). Pursuant to BV's 1998 merger with German bank Bayerische Hypotheken-und Wechselbank, the merged entity was known thereafter as Bayerische Hypo -und Vereinsbank AG (hereinafter "HVB"). DeGiorgio also owned and controlled an entity known as Redo, Inc.

8.    At various times between 1993 and 2003, two additional individuals from Saipan (hereinafter "Saipan Co-conspirator-2" and "Saipan Co-conspirator-3"), co-conspirators not named as defendants herein, were senior officers of the Saipan Company.

9.    Between 1993 and 2003, an individual residing in the Philippines (hereinafter "the Philippines Co-conspirator") was a citizen and resident of the Philippines and the owner of a small construction company located in or around Manila, the Philippines (hereinafter "the Philippines Company").

10.    Between 1993 and 2003, an individual residing in Oslo, Norway (hereinafter "the Norwegian Co-conspirator") was an accountant and a citizen of Norway. In addition, the Norwegian Co-conspirator was the nominal owner of, or was otherwise affiliated with, various corporate and other entities, including, among others: Skandia; Skandia Capital LLC; Petavest, Inc.; Orinda Investments, Ltd.; Ocner; and Helminvest.

### Statutory Allegations

11.    From in or about 1993 until in or about 2003, in the Southern District of New York and elsewhere, ROBERT PFAFF, the defendant, together with others known and unknown, including Chandler S. Moisen, Domenick DeGiorgio, Saipan Co-conspirator-1, Saipan Co-conspirator-2, Saipan Co-conspirator-3, the Philippines Co-conspirator, and the Norwegian Co-conspirator, co-conspirators not named as defendants herein, unlawfully, willfully and knowingly did combine, conspire, confederate and agree to defraud the United States and an agency thereof, to wit, the Internal Revenue Service ("IRS") of the United States Department of Treasury, and to commit offenses against the United States, to wit, violations of Title 26, United States Code, Sections 7201, and 7206(1), and Title 18, United States Code, Sections 1341, 1343, and 1346.

## Objects Of The Conspiracy

12.    It was a part and object of the conspiracy that, from in or about 1993 through in or about 2003, ROBERT PFAFF, the defendant, together with others, unlawfully, willfully, and knowingly would and did defraud the United States of America and an agency thereof, to wit, the IRS, by impeding, impairing, defeating, and obstructing the lawful governmental functions of the IRS in the ascertainment, evaluation, assessment, and collection of income and other taxes due and owing to the United States as a result of the receipt of income generated by the conspirators through certain tax shelter transactions, as described in paragraphs 17 through 18, below.

13.    It was a further part and object of the conspiracy that, from in or about 1993 through in or about 2003, ROBERT PFAFF, the defendant, together with others, unlawfully, willfully, and knowingly, would and did attempt to evade and defeat a substantial part of the income taxes due and owing to the IRS by ROBERT PFAFF, the defendant, and other co-conspirators as a result of the receipt of income generated by the conspirators through certain tax shelter transactions, as described in paragraphs 17 through 18, below, in violation of Title 26, United States Code, Section 7201.

14.    It was a further part and object of the conspiracy that, from in or about 1993 through in or about 2003, ROBERT PFAFF, the defendant, together with others, unlawfully, willfully, and knowingly would and did make and subscribe false and fraudulent United States individual, corporation, and partnership tax returns for various

-5-

tax years between 1993 and 2002, which returns contained and were verified by written declarations that they were made under the penalties of perjury, and which PFAFF and the others did not believe to be true and correct as to every material matter, to wit, PFAFF and his co-conspirators subscribed and caused to be subscribed, and thereafter filed and caused to be filed with the IRS, individual, partnership, and corporation income tax returns that failed to report fee income generated and received by the conspirators through tax shelter transactions, as described in paragraphs 17 through 18, below, in violation of Title 26, United States Code, Section 7206(l).

15.    It was a further part and object of the conspiracy that, from in or about 1993 through in or about 2003, ROBERT PFAFF, the defendant, together with others, unlawfully, knowingly, and intentionally having devised and intending to devise a scheme and artifice to defraud the CNMI tax authorities, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and a scheme to defraud the Saipan Company and its shareholders of their intangible right to the honest services of Saipan Co-conspirator-1, Saipan Co-conspirator-2, and Saipan Co-conspirator-3, for the purpose of executing such scheme and artifice and attempting so to do, would and did (i) transmit and cause to be transmitted by means of wire and radio communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit, interstate telephone calls, faxes, and e-mails, in violation of Title 18, United States Code, Sections 1343 and 1346, and (ii) cause matters and things to be

delivered by mail and private interstate carrier according to the directions thereon, to wit, correspondence, invoices, bank drafts, and checks, in violation of Title 18, United States Code, Sections 1341 and 1346.

## Means And Methods Of The Conspiracy

16.    Among the means and methods used by ROBERT PFAFF, the defendant, and his co-conspirators to achieve the objects of the conspiracy were the following:

## The Tax Shelter Fee Income

17.    Between 1993 and 2002, ROBERT PFAFF, the defendant, together with others, caused various entities and individuals, including the Philippines Co-conspirator and the Norwegian Co-conspirator, to participate with United States and CNMI taxpayers in certain tax shelter transactions. Those tax shelter transactions resulted in millions of dollars of fee income being generated by, and subsequently divided among, the designers, marketers, and implementers of the tax shelter transactions, including PFAFF.  Between 1993 and 2000, PFAFF received, directly and indirectly, in excess of $3,750,000 in fee income from those tax shelter transactions (hereinafter "the tax shelter fee income" or "fee income").    PFAFF used that fee income for various personal purposes, including: to purchase his principal residence in Englewood, Colorado, and a weekend home in Breckenridge, Colorado; to purchase his mother's home in Wisconsin; to purchase various automobiles, including a Porsche for himself, a Mercedes Benz for

-7-

his sister, and a Subaru for his wife; to purchase various interests in mutual funds; to fund various trusts for his children; to make gifts to family members; to pay initiation fees at his country club in or around Denver, Colorado; to renovate and landscape his Colorado home; to pay dentist bills; and to purchase a Steinway piano and Hawaiian artwork.

18.    Among the tax shelter transactions that were designed, marketed, and implemented by ROBERT PFAFF, the defendant, and his co-conspirators, and which resulted in the payment of fee income to PFAFF and others were: (i) transactions involving the Saipan Company in its capacity as a CNMI corporate taxpayer seeking to eliminate or reduce millions of dollars of its tax obligations; (ii) transactions in which the Saipan Company or one of its shareholders advanced funds to finance certain transactions that did not involve the Saipan Company as a taxpayer; (iii) transactions in which PFAFF provided tax services and advice on behalf of KPMG while simultaneously and secretly agreeing with his co-conspirators to share in the profits generated through the implementation of the transactions; and (iv) transactions in which DeGiorgio, PFAFF and their co-conspirators enlisted HVB or its predecessor bank to provide purported financing or otherwise participate.

## The Concealment Of The Tax Shelter Fee Income From The IRS And Others

19.    In order to conceal the receipt of the tax shelter fee income by ROBERT PFAFF, the defendant, and his co-conspirators from the IRS and other taxing authorities, including the tax authorities in the CNMI, and in order to allow the Saipan co-

conspirators to defraud the Saipan Company and its shareholders of their intangible right to the honest services of its officers and employees, PFAFF and his co-conspirators employed a number of elaborate, deceitful, and fraudulent means. Those means included the following:

a.    PFAFF and his co-conspirators would and did cause the payment of the tax shelter fee income to PFAFF to be concealed from, and not disclosed to, KPMG, in violation of KPMG's partnership bylaws and/or rules and procedures;

b.    PFAFF and his co-conspirators would and did cause the payment of the tax shelter fee income to DeGiorgio to be concealed from, and not disclosed to, HVB;

c.    PFAFF and his co-conspirators would and did cause the payment of the tax shelter fee income to the Saipan Co-conspirators to be concealed from, and not disclosed to, the Saipan Company;

d.    PFAFF and his co-conspirators would and did cause millions of dollars of tax shelter fee income to be sent from bank accounts in the United States and the CNMI to bank accounts in Manila, Philippines (hereinafter the "Philippines bank accounts"), which accounts were controlled by the Philippines Co-conspirator and others;

e.    PFAFF and his co-conspirators would and did request that the Philippines Co-conspirator, in exchange for the payment of fees to the Philippines Co-conspirator, disburse the tax shelter fee income from the Philippines bank accounts in accordance with the instructions of PFAFF and his co-conspirators, including instructions

that checks and demand drafts be drawn on, and wire transfers be made from, the Philippines bank accounts and directed to individuals and entities designated by PFAFF, Moisen, DeGiorgio, and Saipan Co-conspirator-1, which checks, drafts, and wire transfers PFAFF, Moisen, DeGiorgio, and the Saipan co-conspirators used to acquire assets, pay personal debts, and make gifts;

      f.     PFAFF and his co-conspirators would and did cause millions of dollars of fee income to be sent to the bank accounts of an attorney located in Denver, Colorado, and the Norwegian Co-conspirator, both of whom assisted PFAFF and his co-conspirators in the implementation of the tax shelter transactions and the disbursement of the fee income to PFAFF and his co-conspirators; and

      g.     PFAFF and his co-conspirators would and did cause the formation of companies named Kernings Finance Ltd. and Far East Ltd. as offshore subsidiaries of the Saipan Company and would and did use them in various tax shelter transactions and the subsequent receipt of fee income from those transactions by PFAFF and his co-conspirators.

## The False And Fraudulent Tax Reporting By PFAFF

      20.     On the U.S. Individual Income Tax Returns that he caused to be prepared, signed, and filed for himself and his spouse for tax years between 1993 and 2000, ROBERT PFAFF, the defendant, falsely and fraudulently omitted his portion of the tax shelter fee income he received, as described above. In addition, on the U.S. Individual

Income Tax Return that he caused to be prepared, signed, and filed for himself and his spouse for tax year 2001, PFAFF falsely and fraudulently reported consulting fee income he had not received during the tax year 2001, as a cover for his failure to report tax shelter fee income he received in 1997-1999. In addition, on the U.S. Individual Income Tax Return that he caused to be prepared, signed, and filed for himself and his spouse for tax year 2002, PFAFF falsely and fraudulently listed an investment interest expense deduction relating to business loans he purportedly had, whereas, in truth and fact, PFAFF had incurred no true interest expense.

## The Creation Of Phony Loan Documents To Disguise PFAFF's Fee Income And To Disguise PFAFF's Purchase Of Stock In The Saipan Company

21.    Following the IRS's commencement, in or about 2000 and 2001, of investigations into tax shelter transactions, ROBERT PFAFF, the defendant, Saipan Co-conspirator-1, and the Philippines Co-conspirator agreed to create a series of phony documents in an attempt to make it falsely and fraudulently appear that millions of dollars of tax shelter fee income PFAFF received between 1996 and 2000 was not fee income but, instead, was a series of loans made to PFAFF by the Philippines Co-conspirator through the Philippines Company. Accordingly, between 2000 and 2002, PFAFF and the Philippines Co-conspirator, with the assistance of Saipan Co-conspirator-1, created and signed bogus promissory notes in the amounts of $750,000, $1,000,000, and $750,000 and back-dated those notes and related documents using "as of" dates of September 30, 1997,  December 31, 1997, and December 31, 1998, respectively.  Those notes falsely

reflected that, in 1997 and 1998, the Philippines Co-conspirator had loaned money to PFAFF through a secured line of credit, whereas, in truth and fact, no such lending relationship existed.

22.    In or about September 2000, ROBERT PFAFF, the defendant, purchased approximately 35,000 shares of the Saipan Company using the Philippines Co-conspirator as a nominee purchaser. In order to disguise that purchase and simultaneously make it appear as if he were making loan re-payments to the Philippines Co-conspirator on the bogus promissory notes described in paragraph 21, on or about September 20, 2000, PFAFF caused $1,227,646 to be wire-transferred from his personal bank account in the United States to the Philippines Co-conspirator in Manila.  After taking a $10,000 fee that PFAFF promised him in exchange for acting as the nominee purchaser of the 35,000 shares of Saipan Company, the Philippines Co-conspirator transferred the balance of the PFAFF funds, or $1,217,646, to the Saipan Company on or about September 25, 2000, as payment for the 35,000 shares. To disguise the true nature of PFAFF's transfer of the $1,227,646, PFAFF, Saipan Co-conspirator-1, and the Philippines Co-conspirator falsely and fraudulently included the September 25, 2000 funds transfer on bogus loan draw and repayment schedules, which made the PFAFF funds transfer falsely and fraudulently appear as a loan repayment from PFAFF to the Philippines Co-conspirator rather than what the funds transfer truly represented — PFAFF's payment for shares held by a nominee.

-12-

23.    On or about September 27, 2000, after receiving the PFAFF funds through the Philippines Co-conspirator, the secretary of the Saipan Company issued a stock certificate for the 35,000 shares of the Saipan Company in the name of JW Acquisition Corp. LLC, an entity owned and controlled by PFAFF — demonstrating that the payment from PFAFF to the Philippines Co-conspirator was not a true loan repayment but was, in reality, PFAFF's purchase of shares in the Saipan Company through a nominee.  Upon recognizing that issuance of the certificate in the name of PFAFF's company would reveal PFAFF's purchase and thus true ownership of the shares and not the repayment of any indebtedness to the Philippines Co-conspirator, Saipan Co-conspirator-1 and PFAFF caused the Saipan Company's secretary's issuance of the share certificate in the name JW Acquisition Corp LLC to be voided the same day and thereafter caused the share certificate to be re-issued in the name of the Philippines Company.

24.    In  or about November 2001, ROBERT PFAFF, the defendant, Saipan Co-conspirator 1, and the Philippines Co-conspirator agreed that they would create an additional series of false and fraudulent documents in order to transfer the 35,000 shares from the name of the Philippines Company to a trust PFAFF had created for his children (hereinafter the "PFAFF Children's Trust").  PFAFF and his co-conspirators agreed to do this by making it appear that the Philippines Co-conspirator wished to sell the 35,000 shares to the PFAFF Children's Trust.  Pursuant to this

-13-

agreement, the Philippines Co-conspirator signed a letter dated November 20, 2001 and addressed to Saipan Co-conspirator-1 advising that he (the Philippines Co-conspirator) wished to sell the 35,000 shares back to the Saipan Company or any "potential buyer," and, further, that Saipan Co-conspirator-1 could "hold [the 35,000] shares in trust until a buyer is found and the terms of the sale are approved by me."

25.    On or about December 19, 2001, Saipan Co-conspirator-1 drafted and signed a letter informing the Philippines Co-conspirator that a "buyer" had purportedly made an offer to purchase the 35,000 shares purportedly owned by the Philippines Co-conspirator. Pursuant to this purported offer and the purported subsequent acceptance of the offer by the Philippines Co-conspirator, Saipan Co-conspirator-1 caused a stock certificate for 35,000 shares of the Saipan Company to be issued on December 27, 2001 in the name of PFAFF's brother-in-law, the trustee of the PFAFF Children's Trust. The share certificate issued in the trustee's name was shortly thereafter voided and replaced by a share certificate in the name of the PFAFF Children's Trust. The PFAFF Children's Trust made no payment for the 35,000 shares at the time of the December 2001 transfer of the shares to the PFAFF Children's Trust because PFAFF had already paid for the shares and owned them through his nominee — the Philippines Co-conspirator. However, after PFAFF's individual income tax returns came under audit by the civil examination branch of the IRS, as detailed below, "payment" for the 35,000

shares purportedly sold by the Philippines Co-conspirator to the PFAFF Children's Trust was made on September 6, 2002.

26.    In or about early February 2002, ROBERT PFAFF, the defendant, decided to purchase an additional 17,500 shares of stock of the Saipan Company. In order to disguise his purchase of the 17,500 shares of the Saipan Company's stock and simultaneously make it appear as if he were making an additional loan re-payment to the Philippines Co-conspirator pursuant to the bogus promissory notes described in paragraph 21, on or about February 5, 2002, PFAFF caused $629,849 to be wire-transferred from a trust account in the United States to the Philippines Co-conspirator in Manila. After taking a $25,000 fee that PFAFF promised him in exchange for acting as the nominee purchaser of the 17,500 shares of stock of the Saipan Company, the Philippines Co-conspirator transferred the balance of the PFAFF funds, or $604,849, to the Saipan Company on or about February 7, 2002, as payment for the 17,500 shares. On or about April 27, 2002, the secretary of the Saipan Company issued a stock certificate for 17,500 shares of the Saipan Company in the name of the Philippines Company. Pursuant to an agreement reached between PFAFF, Saipan Co-conspirator-1, and the Philippines Co-conspirator, the shares were issued in the name of the Philippines Company but were being held on behalf of PFAFF. In addition, to disguise the true nature of the transfer by PFAFF of the $629,649, PFAFF, Saipan Co-conspirator-1, and the Philippines Co-conspirator included this funds transfer on false and fraudulent loan and repayment

schedules prepared by Saipan Co-conspirator-1, which made the funds transfer appear as a purported loan repayment by PFAFF pursuant to the bogus promissory notes, whereas, in truth and fact, the payment was for shares of stock for PFAFF, to be held by the Philippines Co-conspirator, PFAFF's nominee. The Philippines Co-conspirator held the shares as nominee for PFAFF until November 17, 2003, at which time PFAFF, Saipan Co-conspirator-1, and the Philippines Co-conspirator created an additional series of false and fraudulent documents making it appear that an entity owned and controlled by PFAFF was purchasing the 17,500 shares from the Philippines Co-conspirator.

27.    On or about February 21, 2002, ROBERT PFAFF, the defendant, Saipan Co-conspirator-1, and the Philippines Co-conspirator created additional false and fraudulent documents, including fraudulent loan and repayment schedules, consulting agreements, and compensation documents, in order to disguise the tax shelter fee income that PFAFF had received but failed to report to the IRS. In the consulting agreement and compensation documents, PFAFF and his co-conspirators attempted to make it appear as if PFAFF had provided consulting services for the Philippines Company for which PFAFF was owed approximately $750,000. In truth and fact, PFAFF had provided no consulting services to the Philippines Company and was not owed the $750,000 by that company.

**The False Statements In Connection With The IRS Audit**
**And The False And Fraudulent 2001 And 2002 Income Tax Returns**

28.    In or about early September 2002, the civil examination division of

the IRS commenced an audit of the individual income tax returns of ROBERT PFAFF,

the defendant, for the 1998 and 1999 tax years. Realizing that no payment had been made

in connection with the purported "sale" of the 35,000 shares to the PFAFF Children's

Trust by the Philippines Co-conspirator in November 2001, PFAFF caused Saipan Co-

conspirator-1 to write a letter to PFAFF's brother-in-law, the trustee of the PFAFF

Children's Trust, stating that payment was "now due" with respect to the 35,000 shares.

In response, on September 6, 2002, PFAFF caused $1,217,650 to be wire-transferred

from a bank account of the PFAFF Children's Trust located in the United States to the

Saipan Company, which Saipan Co-conspirator-1 thereafter wire-transferred to an

offshore bank account in Hong Kong. In connection with this latter transfer, Saipan Co-

conspirator-1 created and placed in the files of the Saipan Company a series of false and

fraudulent documents making it appear as if the Saipan Company had assisted the

Philippines Co-conspirator in consummating the sale and transfer of the 35,000 shares by

the Philippines Co-conspirator to the PFAFF Children's Trust in 2002. In truth and fact,

PFAFF, the Philippines Co-conspirator, and Saipan Co-conspirator-1 understood and

agreed that the $1,217,650 sent to the Philippines Co-conspirator in September 2002 was

not payment for the sale or transfer of the 35,000 shares but was, instead, PFAFF's

money that would be held by the Philippines Co-conspirator offshore until the various IRS investigations wound down.

29.    In or about October 2002, ROBERT PFAFF, the defendant, provided his Colorado-based tax preparer with various documents related to the preparation of his 2001 U.S. Individual Income Tax Return, Form 1040. Among those documents were the phony "consulting services" and "compensation" documents described in paragraph 27, above, which PFAFF had since amended to raise the total of the purported compensation owed to PFAFF by the Philippines Company from $750,000 to $1,450,000. In reliance on these phony documents, PFAFF's tax preparer prepared, and PFAFF signed and caused to be filed with the IRS, a false and fraudulent U.S. Individual Income Tax Return for the 2001 tax year that reported $1,450,000 in consulting fee income from the Philippines Company. In truth and fact, PFAFF had not provided any consulting services to the Philippines Company or earned compensation from that entity. Instead, PFAFF had received and failed to report to the IRS fee income in earlier tax years from tax shelter transactions, and was reporting phony consulting fee income in October 2002 only as a result of the IRS's scrutiny of his tax returns.

30.    In or about February 2003, the IRS examination division agent (the "IRS Revenue Agent") who was conducting the civil examination of the 1998 and 1999 tax returns of ROBERT PFAFF, the defendant, expanded the examination to include PFAFF's 2000 and 2001 tax returns. Pursuant to information and document requests

("IDRs") sent to PFAFF by the IRS in 2002 and 2003, the IRS Revenue Agent sought, among other things, information relating to the existence of any loans and loan repayments by PFAFF during the 1998, 1999, and 2000 tax years. In response to those IDRs, PFAFF provided documents, schedules, and other information in which he falsely and fraudulently claimed that he had received secured loans from the Philippines Company in various amounts during the 1998-2000 tax years.

31.    On or about June 12, 2003, ROBERT PFAFF, the defendant, provided sworn testimony to the IRS Revenue Agent with respect to, among other things, his 2001 U.S. Individual Income Tax Return, on which PFAFF had reported approximately $1,450,000 in consulting fee income he purportedly received from the Philippines Company in 2001. When asked by the IRS Revenue Agent about that item of income, PFAFF falsely and misleadingly stated that he was paid that income by the Philippines Company in 2001 for services provided to the Philippines Company, and added that "[the Philippines Company] said they would love to use me again if they have the right project . . . ." In truth and fact, the $1,450,000 item of consulting fee income reported by PFAFF on his 2001 tax return was not for services provided to the Philippines Company, but was, instead, tax shelter fee income earned by and paid to PFAFF between 1997 and 1999, which PFAFF had reported on his 2001 tax return as a result of the IRS civil examination.

32.    In or about October 2003, ROBERT PFAFF, the defendant, provided his Colorado-based tax preparer with various documents related to the preparation of his 2002 U.S. Individual Income Tax Return, Form 1040. Among those documents were bogus loan repayment schedules that falsely and fraudulently characterized the tax shelter fee income disbursed to PFAFF between 1997 and 2000 as loans, and payments made to the Philippines Co-conspirator for the shares of the Saipan Company as purported loan re-payments.  Based on the false characterization of the payments between the Philippines Co-conspirator and PFAFF, including purported interest payments on the purported loans, PFAFF caused his Colorado tax preparer to claim on PFAFF's 2002 tax return an investment interest expense deduction of approximately $46,288 on the Schedule A to that tax return.  PFAFF signed that false and fraudulent 2002 tax return on October 13, 2003 and caused it to be filed with the IRS on or about October 15, 2003.

### Overt Acts

33.    The following overt acts, among others, were committed, and caused to be committed, in the Southern District of New York and elsewhere, by ROBERT PFAFF, the defendant, and his co-conspirators in furtherance of the conspiracy and to effect its objects:

a.    On or about January 20, 1994, ROBERT PFAFF sent a letter from Denver, Colorado to various individuals, including co-conspirators Chandler S. Moisen (in Colorado) and Domenick DeGiorgio (in New York), in which PFAFF outlined the

steps involved in a tax shelter transaction known as "MRG," which had been structured by PFAFF, Moisen, and others and was financed in part with funds advanced by the Saipan Company.

b.    In or about February 16, 1994, Chandler S. Moisen sent a fax from New York, New York, to Saipan Co-conspirator-1 in Saipan indicating that co-conspirator Domenick DeGiorgio had obtained tentative approval for the New York branch of BV bank to participate in the MRG tax shelter transaction.

c.    Between April and May 1994, the MRG tax shelter transaction was implemented by ROBERT PFAFF, Chandler S. Moisen, Domenick DeGiorgio, Saipan Co-conspirator-1, and others.

d.    In or about June 1994, as a result of the completion of the MRG tax shelter transaction, Saipan Co-conspirator-1 drew checks on the Saipan-based bank account of Far East Ltd. and payable to the following entities in the following amounts: Redres, Inc. (Moisen's company) — $40,000; Redo (DeGiorgio's company) — $10,655; KPMG — $7,251; and a Colorado law firm — $13,637.

e.    On or about September 8, 1994, Domenick DeGiorgio faxed from New York, New York, to California a letter that DeGiorgio had sent to a prospective tax shelter client explaining a tax shelter transaction that had been designed by ROBERT PFAFF and Chandler S. Moisen.

f.    In or about and between 1994 and February 1995, ROBERT PFAFF, Chandler S. Moisen, Saipan Co-conspirator-1, Saipan Co-conspirator-2, and the Norwegian Co-conspirator implemented a tax shelter transaction involving Arizona real estate (the "Arizona Transaction"), which was financed in part by funds provided by the Saipan Company.

g.    On or about January 10, 1995, ROBERT PFAFF faxed a letter from Denver, Colorado, to Chandler S. Moisen and Saipan Co-conspirator-1.  In the letter, PFAFF proposed "how profits should be divided, bonuses paid and advances recouped" based on the implementation by PFAFF, Moisen, Saipan Co-conspirator-1, and others of certain tax shelter transactions.

h.    On or about February 3, 1995, ROBERT PFAFF faxed another letter and attached schedules from Denver, Colorado, to Chandler S. Moisen and Saipan Co-conspirator-1.  In the letter and schedules, PFAFF calculated the fee income amounts that PFAFF, Moisen, Saipan Co-conspirator-1, Saipan Co-conspirator-2, and the Norwegian Co-conspirator had received and were expecting to receive from certain tax shelter transactions, including the Arizona Transaction. Among the income distributions that PFAFF discussed in the letter were distributions in the approximate amount of $150,000 to each of PFAFF, Moisen, Saipan Co-conspirator-1, and Saipan Co-conspirator-2.

i.    In or about February 1995, the Arizona Transaction implemented by ROBERT PFAFF, Chandler S. Moisen, and Saipan Co-conspirator-1 was consummated,

leading to the wire transfer of over $1,200,000 to a Kernings Finance Ltd. bank account located in Saipan, which was controlled by Saipan Co-conspirator-1.

      j.    Between February 13, 1995 and March 9, 1995, Saipan Co-conspirator-1 drew checks on the account of Kernings Finance Ltd. totaling approximately $150,000, and payable to himself, which checks he deposited in his personal bank accounts in Saipan.

      k.    Between February 21, 1995 and March 8, 1995, Saipan Co-conspirator-1 drew checks on the account of Kernings Finance Ltd. totaling approximately $152,500 and payable to Saipan Co-conspirator-2, which Saipan Co-conspirator-2 deposited in his personal bank accounts in Saipan.

      l.    Between February 10, 1995 and March 27, 1995, Saipan Co-conspirator-1 drew checks on the account of Kernings Finance Ltd. totaling approximately $275,000 and payable to Chandler S. Moisen, his company, and his then-spouse, which Moisen deposited in his personal bank accounts.

      m.    From in or about August 1995 through February 1996, ROBERT PFAFF, together with Chandler S. Moisen and others, devised and implemented, through the use of "Skandia" and a bank located in New York, New York, a tax shelter transaction relating to the sale, by a client of KPMG, of a building located in San Francisco.

      n.    On or about February 1, 1996, ROBERT PFAFF sent a letter via fax from the KPMG offices in Denver, Colorado, to Chandler S. Moisen and the Norwegian

Co-conspirator, in which PFAFF, among other things: (i) stated that he had "enclosed what I [PFAFF] believe is our Skandia arrangement for 1996"; (ii) stated that, "I believe we need to run this enterprise [Skandia] like a real business for the next twelve months"; (iii) discussed how $150,000 would be distributed, "at the Skandia level," among each of the three members of Skandia LLC, declaring, "What a 'gift' this is to us all!"; (iv) proposed how expenses should be paid, and profits distributed, from certain tax shelter transactions; (v) proposed responsibilities for PFAFF, Moisen, and the Norwegian Co-conspirator for generating tax shelter transactions in 1996, with PFAFF's self-described responsibility being to "[w]ork the KPMG systems for leads and details"; (vi) requested that Moisen and the Norwegian Co-conspirator respond to the faxed letter after they had had a chance to review it; and (vii) stated that he (PFAFF) "would prefer that you [Moisen and the Norwegian Co-conspirator] use [PFAFF's] home address for correspondence."

      o.    On or about February 6, 1996, Chandler S. Moisen sent a memorandum to ROBERT PFAFF in response to PFAFF's letter of February 1, 1996. In his memo, Moisen discussed the implementation of potential tax shelter transactions, and proposed that he (Moisen) serve as president of Skandia Capital Group in effectuating transactions and carrying on business with PFAFF.

      p.    On or about February 12, 1996, at the request of ROBERT PFAFF, the Philippines Co-conspirator caused a cashier's check in the amount of $5,000 and

payable to a real estate concern in Colorado be drawn on a Philippines bank account and sent to PFAFF in Denver, which check PFAFF used to make a deposit on the purchase of a second home located in Breckenridge, Colorado.

      q.    On or about March 11, 1996, ROBERT PFAFF caused an attorney in Denver, Colorado, to wire-transfer approximately $150,000 in tax shelter fee income from the attorney's bank account in Denver to accounts of trusts set up by PFAFF for his three children.

      r.    On or about March 13, 1996, the Norwegian Co-conspirator sent a facsimile to the New York, New York, branch of BV bank directing that a wire-transfer in the amount of $228,000 be sent from a New York-based BV account of Skandia Capital Group Limited to an account of the Philippines Co-conspirator located in Manila, Philippines, which funds were profits from the tax shelter transaction referred to in overt act "m," above.

      s.    On or about July 29, 1996, pursuant to instructions provided by ROBERT PFAFF, the Philippines Co-conspirator caused cashier's checks in the amount of $11,121 and $83,982 to be drawn on a Philippines bank account and sent to PFAFF in Colorado, which checks PFAFF used to pay for, respectively, the private school tuition of PFAFF's eldest son and certain real estate located in Breckenridge, Colorado.

      t.    On or about September 3, 1996, Chandler S. Moisen sent a fax from Castle Rock, Colorado, to Saipan Co-conspirator-1, in which Moisen (i) advised Saipan

Co-conspirator-1 that funds totaling $414,000 ("subject to final numbers") were to be made available, in the "next day or two," in a bank account of the Philippines Co-conspirator; (ii) requested Saipan Co-conspirator-1 to ask the Philippines Co-conspirator "to take $25,000 for his services rendered"; (iii) requested a series of checks to be sent to Moisen via DHL courier; (iv) advised that "Bob [PFAFF]" will send a fax to Saipan Co-conspirator-1 that will contain PFAFF's instructions as to how funds should be disbursed to PFAFF; and (v) advised that the Norwegian Co-conspirator, referred to by Moisen as "the flying Norwegian," will also send a fax containing the Norwegian Co-conspirator's request how funds should be disbursed to the Norwegian Co-conspirator.

u.    In or about and between September 1996 and December 1996, ROBERT PFAFF, Chandler S. Moisen, Saipan Co-conspirator-1 and certain other co-conspirators implemented a tax shelter transaction for the Saipan Company designed to produce losses to offset taxable income that the Saipan Company received during the 1996 tax year in the form of a dividend from its interest in an asset.

v.    In or about early January 1997, Chandler S. Moisen sent a fax from Southern California to the San Francisco, California office of one of the promoters of the tax shelter transaction referred to in overt act "u" requesting that approximately $1,400,000 in fees be wire-transferred to an account of the Philippines Co-conspirator in Manila, which fees represented the profits of ROBERT PFAFF, Moisen, and Saipan Co-conspirator-1 from the transaction.

w.    On or about January 10, 1997, pursuant to instructions provided by ROBERT PFAFF designed to effectuate the distribution to PFAFF of PFAFF's portion of the tax shelter fee income referred to in overt act "v," the Philippines Co-conspirator caused checks in the amounts of $260,000, $17,000, and $15,851 to be drawn on one of the Philippines bank accounts and sent to PFAFF in Denver, Colorado, which PFAFF used to purchase, respectively, a Breckenridge, Colorado home (held in the name of a corporate entity nominally owned by PFAFF's wife), a Porsche Boxster automobile, and interests in mutual funds.

x.    In or about February 1997, Domenick DeGiorgio sent to Chandler S. Moisen certain personal credit card bills of DeGiorgio together with a handwritten note. In the note, which requested Moisen to pay the credit card bills, DeGiorgio wrote, "I want to keep the payments below $10,000, even to the credit card companies to reduce risk of raising red flag.  Once this is paid down, I'll write checks to bring the other Visa below the $10K level so perhaps we can take care of that next month . . . once these cc's are gone, let's agree to a $5K per month. Anything beyond the $5K per month we should keep offshore somewhere, as you & Bob [PFAFF] keep suggesting."

y.    On or about and between January 1997 and July 1997, ROBERT PFAFF, Chandler S. Moisen, Saipan Co-conspirator-1, and others caused the Saipan Company to engage in a tax shelter transaction designed to produce losses to offset

taxable gains that the Saipan Company received as a result of the sale of assets relating to Continental Airlines (hereinafter "the Continental transaction").

z.    On or about October 15, 1997, ROBERT PFAFF signed and caused to be filed with the IRS a U.S. Individual Income Tax Return, Form 1040, for himself and his wife for the calendar year 1996, which return falsely and fraudulently omitted substantial amounts of tax shelter fee income.

aa.    On or about December 15, 1997, as a result of the consummation of the Continental transaction referred to in overt act "y," ROBERT PFAFF, Chandler S. Moisen, and Saipan Co-conspirator-1 caused fee income in the amount of $3,624,950, to be wire-transferred into one of the Philippines bank accounts.

bb.    On or about December 18, 1997, ROBERT PFAFF sent a fax to Saipan Co-conspirator-1 and the Philippines Co-conspirator in which PFAFF stated, "I am owed $2,156,541" from the tax shelter transaction giving rise to the $3,624,950 fee referred to in overt act "y." In the fax, PFAFF requested that $2,124,541 of the funds be disbursed pursuant to wire-transfer instructions he provided, including $1,000,000 to the corporate entity, nominally owned by his wife, that was utilized to purchased PFAFF's Breckenridge, Colorado, home. PFAFF also (i) instructed that three checks, totaling $32,000 and payable to his relatives and his credit card company, be sent to his former secretary at the offices of KPMG in Denver, Colorado; and (ii) noted that "as soon as Stuart [Moisen] is back we can close out [two other tax shelter] transactions."

-28-

cc.    Between December 1997 and February 1998, the Philippines Co-conspirator caused wire-transfers totaling $2,124,541 to be sent from one of the Philippines bank accounts to bank accounts designated by ROBERT PFAFF in Colorado, which transfers were cleared through Corestates Bank International in New York, New York. These wire transfers represented PFAFF's share of the tax shelter fee income stemming from the Continental transaction.

dd.    On or about February 11, 1998, Chandler S. Moisen sent a fax memorandum to the Philippines Co-conspirator in which Moisen explained that approximately $67,000 would be wire-transferred to one of the Philippines bank accounts.

ee.    On or about March 10, 1998, ROBERT PFAFF sent a fax from Denver to the Philippines Co-conspirator, which was also copied to Chandler S. Moisen, Saipan Co-conspirator-1, and Domenick DeGiorgio in New York.  In the fax, PFAFF (i) informed the Philippines Co-conspirator that a New York-based law firm had formed "a Delaware situs limited liability company (LLC) of which you [the Philippines Co-conspirator] are the sole member and manager"; (ii) informed the Philippines Co-conspirator that the LLC of which the Philippines Co-conspirator was just then informed he was the sole member and manager [Somer Leasing LLC] had just borrowed $500,000 from a Guam-based corporation; (iii) informed the Philippines Co-conspirator that the LLC had been tentatively approved by HVB to "borrow $25 million for a 30-year term"

-29-

in connection with a tax shelter transaction but noted that certain provisions of the loan agreement could result in repayment of the loan within one year; (iv) provided a time-line of events, or steps, of the transaction; and (v) stated that the Philippines Co-conspirator should be able to receive $50,000 as "manager's compensation" at the end of a certain stage of the transaction.

ff.    On or about July 21, 1998, ROBERT PFAFF wire-transferred from Denver, Colorado to Chandler S. Moisen in Southern California approximately $1,024,000, which represented tax shelter fees that PFAFF had agreed to share with Moisen and Saipan Co-conspirator-1.

gg.    On or about October 15, 1998, ROBERT PFAFF signed and caused to be filed with the IRS a U.S. Individual Income Tax Return, Form 1040, for himself and his wife for the calendar year 1997, which return falsely and fraudulently omitted substantial amounts of tax shelter fee income.

hh.    On or about December 23, 1998, Moisen and his co-conspirators caused funds in the approximate amount of $1,025,000 to be deposited into a bank account located in the Philippines, which funds represented fee income generated by ROBERT PFAFF, Chandler S. Moisen, Saipan Co-conspirator-1, and Saipan Co-conspirator-3 as a result of the completion of a tax shelter transaction entered into by the Saipan Company, known as Guam Cable.

ii.    On or about December 24, 1998, in order to obtain his cut of the fees stemming from the Guam Cable transaction, ROBERT PFAFF sent a facsimile from Colorado to the Philippines Co-conspirator in which PFAFF instructed that disbursements from one of the Philippines accounts be made to him via checks or wire transfers directed to: PFAFF's mother (in the amount of $116,000); PFAFF's dentist (in the amount of $11,000); the owner of an Englewood, Colorado, home on which PFAFF was making the final payment (in the amount of $500,000) as part of a $1,500,000 purchase price; PFAFF's credit card company (in the amount of $64,000); and a third party (in the amount of $9,000.00).

jj.    On or about December 29, 1998, the Philippines Co-conspirator caused a wire transfer in the amount of $200,000 to be sent from the Philippines to an account at the Bank of Hawaii in the name W.S. Acquisition Corp., an entity controlled by Chandler S. Moisen and PFAFF.

kk.    In or about March 1999, Chandler S. Moisen and Saipan Co-conspirator-1 paid approximately $50,000 to Saipan Co-conspirator-3 as a result of the assistance provided by Saipan Co-conspirator-3 in the Guam Cable tax shelter transaction.

ll.    On or about April 5, 1999, ROBERT PFAFF, sent a fax from Colorado to the Philippines Co-conspirator in which PFAFF instructed that, from the $100,000 of fees remaining from the $1,025,000 amount deposited in the Philippines

account in December 1998, disbursements from the account should be made to benefit PFAFF via checks payable to: PFAFF's country club (in the amount of $48,000); a music store in Denver ($34,000 for a Steinway Tiffany piano); a home-renovation company ($9,000); and a third party ($9,000).

mm.   On or about July 6, 1999, ROBERT PFAFF sent a memorandum to the treasurer of a company located in California in which PFAFF requested that certain payments due to be made to PFAFF's company as the result of the tax shelter transaction devised and implemented by Moisen, PFAFF, and DeGiorgio, and involving Somer Leasing LLC, be made to Moisen through Moisen's company, resulting in twenty payments being made to Moisen's company between 1999 and 2001.

nn.   On or about October 16, 1999, ROBERT PFAFF signed and caused to be filed with the IRS a U.S. Individual Income Tax Return, Form 1040, for himself and his wife for the calendar year 1998, which return falsely and fraudulently omitted substantial amounts of tax shelter fee income.

oo.   On or about February 15, 2000, ROBERT PFAFF sent a fax to the Philippines Co-conspirator in which PFAFF requested that $59,521 be transferred by the Philippines Co-conspirator "as soon as possible" to a bank in Colorado, for "further credit to Mercedes Benz of Littleton," which funds PFAFF used to purchase a Mercedes Benz CLK 430 for his sister.

pp.     On or about October 13, 2000, Chandler S. Moisen sent an e-mail from California to ROBERT PFAFF in Colorado in which Moisen discussed various fees from tax shelter transactions, including $150,000 paid to "Dom[enick DeGiorgio]".

qq.     On or about October 16, 2000, ROBERT PFAFF signed and caused to be filed with the IRS a U.S. Individual Income Tax Return, Form 1040, for himself and his wife for the calendar year 1999, which return falsely and fraudulently omitted substantial amounts of tax shelter fee income.

rr.     On or about November 1, 2000, ROBERT PFAFF sent to Chandler S. Moisen an e-mail from Denver, Colorado to Southern California, in which PFAFF responded to Moisen's fax of October 13, 2000 and in which, among other things, PFAFF acknowledged that he had "agreed to give [Moisen] and [Saipan Co-conspirator-1] (each) a one-third profits interest" in a tax shelter transaction orchestrated by PFAFF, which payment is referred to in overt act "ff," above.

ss.     On or about January 1, 2001, Chandler S. Moisen sent to ROBERT PFAFF a fax in which Moisen recounted various tax shelter transactions engaged in with PFAFF and others between 1993 and 1999 and requested that PFAFF share with Moisen a greater share of the fees from certain of the transactions. In the fax, Moisen tells PFAFF, among other things, that: "your life would be entirely different if you had not met me . . . . You would not have met Dom [DeGiorgio], and would not have made money off

of the BV deals last year. The bottom line: you would not have left Peat [KPMG] with[] that additional $3.6 million in the bank."

        tt.    On August 11, 2001, Chandler S. Moisen sent an e-mail from California to Domenick DeGiorgio in New York, New York. In the e-mail, which was entitled "Us getting rich," Moisen stated, "Dom, one of my recurring nightmares involves you/me and our receipt of $.  The first used to be that somehow the bank would catch you and we would all go to jail because we were violating federal banking laws. That concern of course was started by Bob [PFAFF] and has largely dissipated. The second nightmare is that the IRS catches on and you/we are nailed for income tax evasion.  People go to jail for that one."  Moisen then suggested that a "better system" be figured out, expressed a hope that DeGiorgio had given "some thought about this too," and concluded by observing, "I would hate to see us ring the re[g]ister and then end up in Leavenworth.  I would assume the government would not have a lot of mercy, considering that the source of the funds was profits from tax shelters."

        uu.    On or about October 9, 2001, Chandler S. Moisen sent an e-mail from Southern California to Saipan Co-conspirator-1 in which Moisen wrote, "Dom and I have a small deal closing and I am trying to remember how much we paid [the Philippines Co-conspirator] in the past when we used his services to cut checks."

        vv.    On or about October 9, 2001, Saipan Co-conspirator-1 responded to Chandler S. Moisen's e-mail of earlier that day by stating, in an e-mail sent from Saipan

to Moisen in California, "Stu we have paid [the Philippines Co-conspirator] from 10,000 to 25,000 depending on the size ."

ww.    On or about October 12, 2001, Chandler S. Moisen sent an e-mail from California to Domenick DeGiorgio in New York relating to the HVB-based bank account of Somer Leasing LLC, the entity that had been employed by Moisen, DeGiorgio, and ROBERT PFAFF in the tax shelter transaction referred to in overt act "ee," above. In the e-mail, Moisen wrote, "Dom, how will we deal with the $ in your absence? I hate to see that account [not] earn any interest. I think for future funds we do it thru Somer thru [the Philippines Co-conspirator]. Pretty clean way to get it out of the country and our names are not associated with the accounts."

xx.    On or about October 13, 2001, Domenick DeGiorgio responded to Chandler S. Moisen's e-mail of the previous day, writing, in an e-mail sent from HVB in New York to Moisen in California, "Let's leave the money there for a week. I'll get the cash out as soon as I return. I also agree with your strategy. Clean is better. By the way, no more e-mails like this ok?"

yy.    On or about October 15, 2001, ROBERT PFAFF signed and caused to be filed with the IRS a U.S. Individual Income Tax Return, Form 1040, for himself and his wife for the calendar year 2000, which return falsely and fraudulently omitted substantial amounts of tax shelter fee income.

zz.    On or about October 31, 2001, Chandler S. Moisen caused four cashier's checks in various amounts totaling $92,000 to be drawn on a bank account located in the Philippines and thereafter sent to him in Laguna Beach, California.

aaa.    In or about February 2002, ROBERT PFAFF and Saipan Co-conspirator-1 caused false and fraudulent loan schedules to be prepared.

bbb.    Between September 2002 and June 2003, ROBERT PFAFF provided false and misleading documents to the IRS in response to various IDRs.

ccc.    In or about October 2002, Domenick DeGiorgio signed and caused to be filed with the IRS a U.S. Individual Income Tax Return, Form 1040, for himself and his wife for the calendar year 2001, which return falsely and fraudulently omitted substantial amounts of tax shelter fee income .

ddd.    On or about October 15, 2002, ROBERT PFAFF signed and caused to be filed with the IRS a U.S. Individual Income Tax Return, Form 1040, for himself and his wife for the calendar year 2001, which return falsely and fraudulently listed approximately $1,450,000 in fee income purportedly paid to him by the Philippines Company.

eee.    In or about June 2003, ROBERT PFAFF provided false and misleading testimony at an interview with the IRS.

fff.    In or about and between March and August 2003, ROBERT PFAFF caused an accountant located in Colorado to prepare schedules of the payments received

from the Philippines Co-conspirator, certain of which payments PFAFF caused to be classified as loans made to PFAFF.

ggg.    In or about October 2003, ROBERT PFAFF caused the schedules referred to in overt act "fff" to be provided to his tax preparer in Colorado.

hhh.    On or about October 15, 2003, ROBERT PFAFF signed and caused to be filed with the IRS a U.S. Individual Income Tax Return, Form 1040, for himself and his wife for the calendar year 2002, which return falsely and fraudulently claimed an investment interest expense deduction pursuant to the purported loan agreements with the Philippines Co-conspirator.

(Title 18, United States Code, Section 371.)

**COUNT TWO**
(Obstructing And Impeding The Due Administration
Of The Internal Revenue Laws)

The Grand Jury further charges:

34.    The allegations in paragraphs 1 through 10 and 12-33 of this Indictment are repeated and realleged as though fully set forth herein.

-37-

35.    From in or about January 1993 through in or about December 2003,

in the Southern District of New York and elsewhere, ROBERT PFAFF, the defendant,

did corruptly obstruct and impede, and endeavor to obstruct and impede, as set forth

above, the due administration of the Internal Revenue Laws.

(Title 26, United States Code, Section 7212(a).)


_____
FOREPERSON

_____
MICHAEL J. GARCIA
United States Attorney

-38-

*United States District Court*

### SOUTHERN DISTRICT OF NEW YORK

## THE UNITED STATES OF AMERICA

vs.

### ROBERT PFAFF,

Defendant.

# INDICTMENT

### 08 Cr.

**(In Violation of Title 18, United States Code, Section 371; Title 26, United States Code, Section 7212(a).)**

### MICHAEL J. GARCIA

United States Attorney.

### A TRUE BILL

Foreperson.

*[handwritten:]* 5/18/08 Filed Indictment Case assigned to Judge Berman

*[handwritten:]* Pitman U.S.M.J